RUSSELL E. RYAN & others *vs.* ZAHAROULA STAVROS.

Worcester. October 6, 1964. — December 10, 1964.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, KIRK, SPIEGEL, & REARDON, JJ.

*Deed,* Construction, Property conveyed. *Real Property,* Boundary, Monument. *Adverse Possession and Prescription. Equity Pleading and Practice,* Master: confirmation of report, findings. *Evidence,* Extrinsic affecting writing.

The entry of a final decree dismissing the bill in a suit in equity heard on a master's report impliedly overruled the plaintiffs' exceptions to the report, impliedly denied their motion to recommit it, and impliedly confirmed it where the trial judge irregularly had failed to act on those matters before entering the final decree. [253]

Where it appeared, in a suit in equity to establish title to a strip of land approximately fifteen feet wide and 100 feet long between property of the plaintiffs and property of the defendant abutting a street, that the deed to the defendant's rectangular property described its northeasterly boundary as beginning at a point 280 feet, "more or less," from the corner of that street and another street and running northwesterly 200 feet "to land of" certain other owners, that a strict adherence to the 280 foot distance would have resulted in that boundary not running to the only point to which the deed could have referred in specifying the "land of" the other owners and would have resulted in the retention of a long narrow strip by the grantor, although the grantor retained no adjoining land, a master correctly concluded that the point at the other

owners' land as a monument should control rather than the 280 foot distance and that the disputed strip was entirely on land to which the defendant held record title.　[258–259]

Extrinsic evidence was admissible to resolve a latent contradiction in and an uncertainty created by the terms used in the description of a boundary in a deed.　[259–260]

In a suit in equity involving a disputed strip of land between property of the plaintiffs and property of the defendant, subsidiary findings by a master respecting the defendant's acts in connection with a curbstone, asphalt paving, and wooden posts and chain in the strip and removal of papers and debris therefrom did not require an inference that the defendant had acquiesced in the boundary claimed by the plaintiffs.　[260–261]

In a suit in equity involving a disputed strip of land between property of the plaintiffs on which there was a diner and property of the defendant on which there was a restaurant, subsidiary findings by a master respecting acts by the plaintiffs' predecessors in title at a time when the strip and the area around the diner had a dirt surface and a sign stood in the middle of the strip and there was a curbstone on the strip near a street did not show that such acts were of such an adverse nature as to require a conclusion either that the plaintiffs had title to the strip by adverse possession or that they had a prescriptive easement therein for parking.　[262–263]

Findings by a master in a suit in equity by the owners of property on which there was a diner against the owner of adjoining land on which there was a restaurant would not have supported an inference that an uninterrupted and open use by the plaintiffs and their predecessors in title of a triangular piece of the defendant's land for access to the diner from a street for more than twenty years under a claim of right had ceased to be adverse during that period and thereafter had become permissive, thereby preventing accrual of a prescriptive easement for such use, merely by the defendant's speaking to the plaintiffs about the extent of her property and arranging for the painting of a curbstone and for removal of "paper accumulations and other debris in the disputed area" [263]; nor would the master's findings have supported an inference that the defendant had terminated the accrual of the plaintiffs' prescriptive easement merely by placing "horses" across the access for a few hours on two occasions when the diner was not open for business.　[263–264]

On the issue in a suit in equity of a prescriptive right to use a small portion of the defendant's land for access to adjacent property on which there was a diner, where it appeared that such use by the plaintiffs as lessees of the diner property had been part of continuous use successively by owners of the diner property who were immediate predecessors in title to the plaintiffs' lessor, by the plaintiffs as lessees, and by the plaintiffs as owners after they had purchased the diner property from their lessor, the use by the plaintiffs as lessees might properly be found to have been under a claim of right and in a chain of privity and could be tacked to such prior and succeeding uses.　[264–265]

BILL IN EQUITY filed in the Superior Court on March 24, 1961.

The suit was heard by *Ford, J.,* on a master's report.

*Walter J. Griffin* for the plaintiffs.

*Sumner W. Elton,* for the defendant, submitted a brief.

SPIEGEL, J.  This is a bill in equity to establish title to a strip of land by adverse possession or to acquire "a right [therein] by prescription to occupy, and park cars."  The plaintiffs also seek to require the defendant[1] to remove an asphalt berm and to "restore the plaintiffs' land to its former condition."  The parties filed objections to the master's report which, under Rule 90 of the Superior Court (1954), are treated as exceptions.  The plaintiffs filed a motion to recommit.  The court below took no action on the exceptions or on the motion to recommit, but entered an interlocutory decree allowing the defendant's motion for a final decree dismissing the bill.  A final decree dismissing the bill was then entered.  The plaintiffs appeal from the interlocutory and final decrees.

The entry of a final decree without first ruling on the plaintiffs' exceptions and their motion to recommit and without prior confirmation of the master's report was highly irregular.  *Courtney* v. *Charles Dowd Box Co. Inc.* 341 Mass. 337, 340.  It is a practice which the court below should make every effort to avoid.  However, the entry of the final decree impliedly overruled the plaintiffs' exceptions, impliedly denied their motion to recommit, and impliedly confirmed the report.  See *Cali* v. *Caliri,* 254 Mass. 488, 490; *Courtney* v. *Charles Dowd Box Co. Inc., supra,* 340.  Whether the master's ultimate findings are correct was open to the trial judge and to this court on appeal.  *Dodge* v. *Anna Jaques Hosp.* 301 Mass. 431, 435.  *Madigan* v. *McCann,* 346 Mass. 62, 64.

A summary of the material facts found by the master follows.  The area in dispute is a strip of land approximately

---

[1] The word "defendant" as used herein refers to Zaharoula Stavros and includes reference to the acts of her son, George Stavros, who was her authorized representative, and to the acts of her late husband, William Stavros, who died in 1951.

fifteen feet wide and extending about 100 feet northwest-
erly between property of the plaintiffs on its northeasterly
side and that of the defendant on its southwesterly side.
The attached sketch-plan indicates the location of the strip.

According to the plaintiffs' deed from one William J.
Maher in 1949, "the southeasterly corner of the plaintiffs'
premises is described as being distant 151.19 feet south-
westerly of the end of a curve connecting the northwesterly
line of Park Avenue and the southwesterly line of Mill
Street." This parcel, roughly 100 feet square, is substan-
tially the same piece of land deeded in 1937 from one Cassie
MacRae to one Signe H. Lussier, and in 1939 from her to
Wilfred and Aurore Lussier.

According to the defendant's deed from MacRae in 1950,
the northeasterly boundary of the defendant's land is de-
scribed as follows: "Beginning at a point which is 280 feet,
more or less, from the southwesterly corner of Park Avenue
and Mill Street, thence turning and running North 41° 53'
West a distance of 200 feet to land of Maher and Hood."
In 1941, MacRae conveyed to H. P. Hood & Sons, Inc.
(Hood) a parcel described in the Hood deed as 479.55 feet
from the corner of Mill Street and Park Avenue. A rear
portion of the Hood land is 200 feet from Park Avenue and
extends in a northerly direction for 225 feet along the north-
westerly line of the defendant's land. "The angles of
the . . . [defendant's] property at Park Avenue and at
the Hood property are right angles." In November, 1950,
MacRae conveyed another parcel (now also owned by the
plaintiffs) to one Miriam K. Maher which extends from the
southerly line of Mill Street until it abuts the northeasterly
boundary of the Hood land "and a portion of what ulti-
mately became the northeasterly boundary" of the defend-
ant's land. This parcel is indicated in the sketch-plan as
"Land of Maher."

In 1940 MacRae leased the area now comprising the de-
fendant's land to one Joseph Jasper. That area was rec-
tangular in shape, its Park Avenue and rear lines each run-
ning 225 feet, and its other two sides running 200 feet. At

that time there was a curve where Mill Street and Park Avenue joined. The original draft of the lease recited, in relevant part, the following: "Beginning at a point which is 280 feet more or less distant from the northwest corner of Park Avenue and Mill Street, so-called, on Park Avenue." The attorney who drafted the lease, in arriving at the figure of "280 feet, more or less," had extended the side lines of Mill Street and Park Avenue to a hypothetical intersection and had measured with a ruler the approximate distance from the intersecting point to the proposed starting point of the land leased to Jasper. In order to fix the boundary of the area leased at the Lussier land (now the plaintiffs' land), a title examiner prior to recording the lease, changed its wording to read: "Beginning at the most southerly corner of land conveyed to one Lussier at a point which is 260 feet more or less distant from the southwest corner of Park Avenue and Mill Street, so-called, on Park Avenue." This change was made with the consent of the lessor and the lessee. In December, 1950, the defendant was the sole owner of all rights under this lease. MacRae then executed a new lease to the defendant with an option in the lessee to buy the land. Soon afterward, a deed thereto was executed to the defendant and placed in escrow with the attorney. At the time of the preparation of the lease and deed of 1950, the attorney had no knowledge of the change in the description which had been made in the lease of 1940.

In 1934, on the land now owned by the plaintiffs, there was a diner set back about fifty feet from Park Avenue. Beginning "in the late 1930s," on the strip of land now in dispute, a sign faced the diner and was also set back fifty feet from Park Avenue. From 1934 to 1937, the diner and surrounding land were owned by MacRae. One Ralph Lussier operated the diner "[f]rom the end of 1934 until 1939." He initially operated it as a subtenant of one Barriere, who held a lease from MacRae. In October of 1937, the land "occupied by the diner" was bought by Signe Lussier, Ralph's wife. A semicircular curbing was installed imme-

diately to the south of the southerly driveway of the diner in 1937 so that an "imaginary line" extended from "the easterly leg of the sign to the center of the curbstone." During the period of occupancy by Ralph, the disputed strip and the area around the diner were not paved. In the winter he arranged for plowing as far as the sign in the rear. He did not indicate parking spaces, nor direct customers where to park. Cars were parked on all sides of the diner, "but there was no evidence as to this period that specifically placed cars in the disputed area."

In 1939 Wilfred and Aurore Lussier bought and began to operate the diner. In 1941 they paved with blacktop the area around the diner, within a foot or two of the billboard sign and along part of the disputed strip down to the curbstone abutting Park Avenue. The Lussiers sold the property in December, 1945, and in January, 1946, the plaintiffs assumed operation of the diner as lessees until 1949, when they bought the land from Maher.

"Wilfred and Aurore Lussier from 1939 to December, 1945, and the plaintiffs since the latter date . . . used the driveway entrance immediately southerly of the diner for ingress and egress between Park Avenue and their property, and . . . they . . . made such use under a claim of right for more than twenty years. [They and] . . . their customers and business invitees have passed and repassed for that period of time over a triangular piece of the disputed premises."

When the defendant purchased her parcel, she "did not clearly realize" the location of its northerly boundary "[b]ecause of the statement of distance made in the lease and deed ('280 feet, more or less')." In order to prevent trucks from cutting through her land from the plaintiffs' diner to Park Avenue, she erected five or six wooden posts with a chain joining them along the southerly line of the area in dispute about six feet south of the "imaginary line" from the sign to the curb. In 1953, she spoke to one of the plaintiffs about a survey which indicated that her land extended to a point north of the sign. But she did not follow

an entirely consistent course in claiming the land. The defendant operated a restaurant on this land. Every two years, between 1950 and 1960, the defendant arranged for painting of the semicircular curbing. During this period persons hired by her removed "paper accumulations and other debris in the disputed area." On the Thanksgiving eves of 1953 and 1954 she set up "horses" across the driveways entering her land from Park Avenue, and, in the disputed area, across one half of the driveway which entered the plaintiffs' premises. On each "horse" was a sign reading "closed." The "horses" and signs remained until about 11 p.m. on Thanksgiving Day in both years at which time they were removed by the defendant. The plaintiffs' diner was not open for business during the hours the "horses" and signs appeared. In 1960 the defendant paved the entire disputed area with asphalt and installed a berm within a few feet of the southerly boundary of the plaintiffs' land.

1. The plaintiffs contend that as a matter of law the northerly boundary of the defendant's property begins 280 feet from the southwesterly corner of Park Avenue and Mill Street, as set forth in her deed. They argue that the defendant's northerly boundary is the southerly boundary of the strip, and that the defendant has no standing to contest title to it. The master, however, found that the strip is entirely on land to which the defendant holds record title. We cannot say the master was in error.

The defendant's deed from MacRae describes the northeasterly boundary of her land as beginning "at a point which is 280 feet, more or less, from the southwesterly corner of Park Avenue and Mill Street, thence turning and running North 41° 53' West a distance of 200 feet to land of Maher and Hood." If there was a contradiction between the words "280 feet, more or less," and the words which tie the boundary line to the point at "land of Maher and Hood," the master was correct in concluding that the latter should control. In the construction of deeds, "where the land conveyed is described by courses and distances and

also by monuments which are certain or capable of being made certain, the monuments govern, and the measurements if they do not correspond must yield.'' *Temple* v. *Benson,* 213 Mass. 128, 132. *Daviau* v. *Betourney,* 325 Mass. 1, 2. It is well established that land of adjoining proprietors may be monuments. *Holmes* v. *Barrett,* 269 Mass. 497, 500. See *Ellis* v. *Wingate,* 338 Mass. 481, 485. The master could have located the point called ''land of Maher and Hood'' by considering that Hood's land along Park Avenue begins about 479 feet from the corner of Park Avenue and Mill Street. Hood's boundary extends northwesterly from that point for 200 feet perpendicular to Park Avenue. It thereupon extends for 225 feet in a northeasterly direction. On the other hand, the land of Maher extends southwesterly from Mill Street until it abuts the land of Hood. The point where the southeasterly corner of the Hood land touches the southwesterly line of the Maher land is the only point to which the defendant's deed can refer as ''land of Maher and Hood,'' and to which the defendant's northeasterly boundary can extend from Park Avenue consistently with the description.

In this connection, it would have been proper for the master to consider that, because of the location of the point called ''land of Maher and Hood,'' strict adherence to the described measurements in the defendant's deed would result in the isolation of a narrow 200 foot strip between the land of the defendant and that of the plaintiffs. It is proper to consider the improbability that a grantor who conveyed all her adjoining land would seek to retain such a relatively useless strip. See *Fulgenitti* v. *Cariddi,* 292 Mass. 321, 326. Thus, in ascertaining the location of the ''land of Maher and Hood'' the master could have found a latent contradiction in the description in the deed which permitted the use of extrinsic evidence to show what boundary the language of the deed was intended to describe. *Temple* v. *Benson,* 213 Mass. 128, 133–134. *Hirsch* v. *Fisher,* 278 Mass. 492, 495. *LaCouture* v. *Renaud,* 325 Mass. 33, 37. Am. Law of Property, § 12.105. Similarly, extrinsic evidence could

have been used to resolve the uncertainty created by the use of the words "more or less" in the description as to the distance of the boundary from the corner of Park Avenue and Mill Street. *Ovans* v. *Castrucci,* 267 Mass. 600, 604.

We note that the same attorney "handled" all the transactions relating to this property as well as the surrounding parcels of Maher and Hood. He arrived at the figure of "280 feet, more or less" by extending the side lines of Mill Street and Park Avenue to a hypothetical intersection and by measuring with a ruler the approximate distance from the intersecting point to the proposed starting point of the land. In the lease to Jasper the title examiner reduced the figure to 260 feet and fixed the northeasterly boundary to abut the southwesterly boundary of the land now owned by the plaintiffs. The other boundaries described in the lease coincide with those described in Hood's deed. The defendant assumed Jasper's lease. It was only through the unawareness of the attorney that the figure "280 feet, more or less" was retained in the new lease and deed to the defendant in 1950.

2. The plaintiffs further contend, rather summarily, that the parties "by their conduct acquiesced" in fixing the defendant's northeasterly boundary somewhere southwesterly of where the master found it to be. The defendant contends that the facts do not support a finding of acquiescence as a matter of law. The master found no acquiescence, and it is open to this court only to determine whether the subsidiary findings require such an inference. *Dodge* v. *Anna Jaques Hosp.* 301 Mass. 431, 435. *Madigan* v. *McCann,* 346 Mass. 62, 64.

The doctrine of acquiescence as established in cases concerning boundary disputes provides merely that, where a description in a deed is of doubtful or ambiguous import, extrinsic evidence is admissible to show the construction given to the deed by the parties and their predecessors in title as manifested by their acts. *Methodist Episcopal Soc. in Charlton City* v. *Akers,* 167 Mass. 560, 563. *Morrison* v. *Holder,* 214 Mass. 366, 369. See *Douglas* v. *Harty,* 343

Mass. 775. But these acts must amount to acquiescence in a line or fence or other indicium *as a boundary.* Mere acquiescence in the existence of a fence or line as a barrier or for some other purpose is not enough to establish a boundary. *Chandler* v. *Hibberd,* 165 Cal. App. 2d 39, 48. *Mahrenholz* v. *Alff,* 253 Iowa, 446, 451. Tiffany, Real Property (3d ed.) § 654. Am. Law of Property, § 12.111. See *Iverson* v. *Swann,* 169 Mass. 582, 583–584; *Douglas* v. *Harty,* 343 Mass. 775.

For many years there has been a curbstone approximately in the middle of the strip on the Park Avenue line. But there is nothing to show that it has ever indicated a boundary even in conjunction with the sign fifty feet northwest of it. The subsequent paving of the ground likewise establishes nothing in this regard. Absent indications of how the parties and their predecessors in title regarded the line of the asphalt's edge, acquiescence can hardly be inferred. Furthermore, the finding that the Jasper lease of 1940 described the northeasterly boundary of the defendant's parcel as "[b]eginning at the most southerly corner of land conveyed to one Lussier [plaintiffs' predecessor in title] at a point which is 260 feet more or less distant from the southwest corner of Park Avenue and Mill Street" militates against such an inference. Nor do the defendant's acts subsequent to her purchase of the parcel support an inference of acquiescence in any boundary other than the one determined by the master. It is true that the defendant at first did not clearly realize the location of the actual boundary. However, she did not erect the wooden posts and chain for the purpose of recognizing another boundary, but in order to prevent trucks from cutting through her land. In addition, between 1950 and 1960, the defendant spoke to one of the plaintiffs about a survey which indicated that the defendant's property extended north of the sign. She also arranged for the periodic painting of the curbstone within the strip and for the removal of papers and debris therein. In short, the master's findings do not require an inference of acquiescence in the boundary as the plaintiffs contend.

3.   The plaintiffs in their brief treat the issue of adverse possession rather cryptically.   Nevertheless, we think it is worthy of discussion.   Title by adverse possession can be acquired only by proof of nonpermissive use which is actual, open, notorious, exclusive and adverse for twenty years. *Holmes* v. *Johnson,* 324 Mass. 450, 453.   *Wilcox* v. *Sarris,* 331 Mass. 701, 703.   *Kershaw* v. *Zecchini,* 342 Mass. 318, 320.   Although earlier acts of the defendant may have terminated the requisite possession, it is assumed that the paving with asphalt and the construction of the berm on the strip by the defendant in October or November of 1960 decisively terminated any accrual of title by adverse possession in the plaintiffs.   *Bowen* v. *Guild,* 130 Mass. 121, 123–124.   See G. L. c. 260, §§ 21–23, 28.   Compare *Rothery* v. *MacDonald,* 329 Mass. 238, 241–242.   On this basis the necessary occupancy by the plaintiffs' predecessors must be found to have begun at least by October or November of 1940.   At that time, the strip and the area around the diner had a dirt surface.   The sign stood in the middle of the strip at the rear, and a curbstone bounded the strip at Park Avenue.   Customers of Ralph Lussier were not directed to park their cars on the strip, and no evidence appeared that any parking occurred there.   In the winters Ralph Lussier arranged for plowing "as far as the sign in the rear."

These facts do not constitute adverse possession.   "The nature and the extent of occupancy required . . . vary with the character of the land, the purposes for which it is adapted, and the uses to which it has been put."   *LaChance* v. *First Natl. Bank & Trust Co.* 301 Mass. 488, 490.   Here, the acts of possession by Ralph Lussier on the relatively unimproved locus were "few, intermittent and equivocal." *Parker* v. *Parker,* 1 Allen, 245, 247.   Compare *Marshall* v. *Francis,* 332 Mass. 282, 286–287; *Kershaw* v. *Zecchini,* 342 Mass. 318, 320.   There was no fencing of land or asserted control over the area as there was in 1941 when the strip was paved with blacktop.   That paving was done too late. Thus, the master's conclusion that no title by adverse possession accrued was supported by his findings.

4. On the basis of the same findings, the master could conclude that no easement by prescription was acquired for parking. There was no open, notorious, continuous and adverse use for twenty years. See *Tucker* v. *Poch,* 321 Mass. 321, 323; *Nocera* v. *DeFeo,* 340 Mass. 783; G. L. c. 187, § 2.

5. The final issue for our consideration is whether the plaintiffs acquired an easement by prescription on a triangular piece of the disputed strip for access to Park Avenue.

From 1939 to December, 1945, Wilfred and Aurore Lussier and the plaintiffs since the latter date used the triangular piece between Park Avenue and their property as a driveway entrance under a claim of right for more than twenty years. Their business invitees also passed and repassed over the same area during that period of time. This prescriptive easement of access could be obtained by uninterrupted, open, notorious and adverse use for twenty years over the land of the defendant. *Nocera* v. *DeFeo,* 340 Mass. 783. Am. Law of Property, §§ 8.53–8.58. G. L. c. 187, § 2. The defendant contends, however, that her conduct, considered as a whole, was sufficient to compel the conclusion that the plaintiffs' use of the easement ceased to be adverse and became permissive. But the findings do not support such an inference. Even though the defendant spoke to one of the plaintiffs about the extent of her property, arranged for painting of the curbstone and removal of papers in the area in question, the plaintiffs appear to have continued the use of the way as they had done before. There is nothing to indicate that the adverse quality of the use disappeared. There was no recognition by the plaintiffs of authority in the defendant to prevent or permit continuance of the use. It is the nonrecognition of such authority at the time a use is made which determines whether it is adverse; and permissive use is inconsistent with adverse use. Restatement: Property, § 458. Am. Law of Property, §§ 8.53–8.54.

Nor do the findings support an inference of termination of the prescriptive easement by the defendant. Her acts of placing "horses" in the area for a few hours on two oc-

casions when the plaintiffs' premises were closed anyway were of no effect. Her rights must at least be asserted to the other party by some unequivocal, "overt act, which, if the easement existed, would be a cause of action." *Brayden* v. *New York, N. H. & H. R.R.* 172 Mass. 225. *Gadreault* v. *Hillman,* 317 Mass. 656, 662. Powell, Real Property, par 413, p. 451. Tiffany, Real Property (3d ed.) § 1205. Walsh, Commentaries on the Law of Real Property § 239, p. 601. The defendant did not effectively block the easement. She did not prevent its acquisition by the method provided in G. L. c. 187, § 3, by posting a notice of her intention to prevent the acquisition on the premises for six successive days, or by personal service duly recorded. See *Rothery* v. *MacDonald,* 329 Mass. 238, 241. Therefore, no inference can be made that the accrual of the plaintiffs' rights was terminated.

The defendant's final contention in this regard is that the plaintiffs' use as lessees from 1945 to 1949 was not under "claim of right" and cannot be tacked. If that is so, the prescriptive period will not have been satisfied, G. L. c. 187, § 2. The issue is one of privity, a requirement of effectual tacking. "A prescriptive period resulting in the creation of a prescriptive right can be made up of several periods of successive adverse use by different persons provided there is privity between the persons making the successive uses. To produce the necessary privity there must be some relation between the successive users of such a nature that the use by the earlier user can fairly be said to be made for the later user, or there must be such a relation between them that the later user can be fairly regarded as the successor to the earlier one." Am. Law of Property, § 8.59. In accord are Restatement: Property, § 464; Powell, Real Property, par. 413, p. 455; Tiffany, Real Property (3d ed.) § 1207. See *Matthys* v. *First Swedish Baptist Church of Boston,* 223 Mass. 544, 546; *Bucella* v. *Agrippino,* 257 Mass. 483, 488.

Here, the master could infer that when William J. Maher, following the occupancy and use by the Lussiers, delivered

possession of the parcel to the plaintiffs as tenants, he evidenced a claim of right to all easements which the plaintiffs were expected to use, namely, the right of access used by the Lussiers. Cf. *Shoer* v. *Daffe,* 337 Mass. 420, 424, distinguishing *Holmes* v. *Johnson,* 324 Mass. 450. In buying the interest of their lessor, the plaintiffs became his successors in interest, thus completing the chain of privity with regard to the use. There was no break in the continuity of use. William J. Maher's role was essentially that of a conduit from the occupancy of the Lussiers to that of the plaintiffs. In effect, the plaintiffs were the successors of the Lussiers in both their parcel and the prescriptive use over the disputed land. On this basis the successive uses could be tacked, and rights to an easement by prescription in the locus for ingress and egress have vested in the plaintiffs.

6. Accordingly, the judge was in error in substituting his conclusion for that of the master. The interlocutory and final decrees are reversed. An interlocutory decree is to be entered overruling the exceptions and confirming the master's report. A final decree is to be entered establishing rights in the plaintiffs to a prescriptive easement as described at the end of the master's report,[2] and enjoining the defendant from interfering with the plaintiffs' use therein.

*So ordered.*

---

[2] "Rights to pass and repass by foot or by vehicle over a triangular piece of the disputed premises, the side lines of which triangular piece are . . . (1) by the northwesterly line of Park Avenue a distance of nine feet in a southerly direction from the southeasterly corner of the plaintiffs' land (which corner is distant 56.62 feet southwesterly of an angle in said street line); (2) by the southwesterly boundary line of the premises owned by the plaintiffs a distance of ten feet in a westerly direction from the said southeasterly corner of the plaintiffs' land."