WILFRED C. PECK & others[1] *vs.* JOHN BIGELOW.

No. 92-P-426.

Suffolk. March 10, 1993. - May 28, 1993.

Present: KASS, KAPLAN, & LAURENCE, JJ.

*Adverse Possession and Prescription. Unlawful Interference.*

Where the record in a proceeding on a claim of adverse possession did not
demonstrate that the claimant's acts on the land in question reached
the level of "actual" or "exclusive" possession, judgment was correctly
entered against the claimant. [555-557]

The evidence at the trial of a claim for unlawful interference with an
agreement for the purchase and sale of land supported a finding for the
claimants. [557-558]

There was no error in the judge's assessment of damages on a claim for
unlawful interference. [558-559]

CIVIL ACTION commenced in the Superior Court Depart-
ment on June 20, 1988.

The case was heard by *John J. O'Brien,* J.

*Charles M. Sabatt* for the defendant.

*Edward O. Proctor* for Wilfred C. Peck.

KAPLAN, J. 1. *Summary.* The locus of this action — claim
and counterclaim — was an unimproved, largely overgrown
lot located in the Monument Beach section of the town of
Bourne, owned of record by the plaintiff Peck and taxed to
him. The defendant Bigelow is the owner of an adjacent lot.
When the defendant learned that Peck's lot had been put up
for sale, he made several offers to buy it. Peck rejected those
bids and instead entered into a purchase and sale agreement
with the other plaintiffs, the Galvins. The defendant offered
a premium to the Galvins to take over their contract, but this
also failed. Then the defendant informed the plaintiffs that

[1]Michael J. Galvin and Karen Prendergast-Galvin.

he had a claim to ownership of the property through adverse possession. This had the effect of chilling the bank financing that the Galvins required.

The plaintiffs commenced the present action against the defendant for tortious interference with the purchase agreement. In response, the defendant counterclaimed to establish his ownership by adverse possession.

The plaintiffs' motion for partial summary judgment to dismiss the counterclaim failed, but the judge said the defendant's position was "very weak." Upon bench trial, the judge concluded that the defendant had not established adverse possession. The judge supported this conclusion by findings that the defendant believed such use as he had made of the land was by permission of the owner, and that the defendant never thought he owned the land. These findings, destructive, as the judge thought, of the counterclaim, supported the plaintiffs' main claim that the defendant's obstruction of their agreement was tortious, i.e., not justified as having been done in good faith. Judgment entered for the plaintiffs upholding the tort claim[2] and dismissing the counterclaim.

Before us are cross appeals: the defendant contends that his counterclaim should have been sustained and the plaintiffs' tort claim denied; the plaintiffs, that larger damages should have been awarded for the tort.

We affirm the judgment appealed from. With respect to the adverse possession counterclaim, attention should be centered on the defendant's activities on the land, in distinction to his belief or state of mind about the matter. The Supreme Judicial Court made this particularly clear in a decision postdating the judge's decision herein.[3] So the judge's approach was misguided. Nevertheless, we agree that the defendant failed in proof of adverse possession: the record is clear that the defendant's acts on the land did not reach the level of

---

[2]In the amount of $7,500: $5,000 to Peck and $2,500 to the Galvins.
[3]*Kendall* v. *Selvaggio*, 413 Mass. 619 (1992).

"actual" or "exclusive" possession.[4] Remand is not needed for any further findings concerning adverse possession. The judge's findings about the defendant's state of mind remain material to the plaintiffs' interference claim and well support that claim.

2. *The record.* a. *Activities on the land.* Peck acquired title to the lot — 6,720 square feet — in May, 1961, and paid taxes on it annually. He visited the place two or three times a year between 1970 and 1990; on each visit he "walked to a corner of the lot, observed, but did not enter because of the poison ivy and the briars and the bushes." The defendant owned and resided on adjacent property which has been in his family since 1929.

The defendant's account of his family's activities on Peck's lot ran as follows, with some of the conflicting evidence noted. From 1936 to 1960 they mowed and used a small area (about thirty by thirty feet). On this space they had a picnic table and lounge chairs from 1936 to 1978. In 1936 they also set up three clotheslines, used until 1970; a rope swing, removed in 1960; and a sandbox, also removed in 1960. The defendant and his father built a henhouse in 1942 and used it to keep chickens until 1970, but there was evidence that the homemade structure was actually located over on the defendant's land. The defendant's mother planted dogwood trees in 1950 and kept them going until 1960, when they died. As to the defendant's activities on the lot ongoing in 1990, he said he had a compost pile, first laid down in 1950, and a pair of lumber piles, started in the 1970's; kept bicycles, scooters, and mopeds from 1936, though contrary evidence indicated that this practice was quite limited; from time to time cut down and removed dead trees; and regularly pruned dead branches, raked leaves, and kept free of debris

---

[4]"Title by adverse possession can be acquired only by proof of nonpermissive use which is *actual,* open, notorious, *exclusive* and adverse for twenty years." *Kendall* v. *Selvaggio,* 413 Mass. 619, 621-622 (1992), quoting from *Ryan* v. *Stavros,* 348 Mass. 251, 262 (1964) (emphasis added). And see G. L. c. 260, §§ 21, 22.

the sides of the lot along two streets; however, he let the brush on the lot grow up after 1980.

As to paths on the lot: the defendant asserted that he had used two paths, and that these remained clear, from 1936 to the time of trial; but there was conflicting testimony that until the summer of 1989 the lot had been so overgrown with bushes as to be virtually impassable, and any paths that once crossed it had not been visible or usable. Indeed, there was testimony from three witnesses that it was nearly impossible to travel across the lot until the defendant cut a new path through it — and cleared out old unused paths — in the summer of 1989, more than a year after he filed his counterclaim in the action. In addition, since at least 1935, the lot's paths had been used by others besides the defendant. The defendant claimed that these were "friends" who were "visiting" the family; children from the neighborhood, he said, rarely stepped onto the lot, and when they did, it was at his invitation. Several witnesses testified, to the contrary, that not only had they used the lot's paths and carved their initials in a large beech tree there, but "everyone" had done so, to the point where carving one's initials in that tree was virtually a rite of passage in Monument Beach.

b. *Defendant's belief.* Asked in cross-examination, "Did you feel that they [Peck as owner] had, more or less, permitted you to use this property without objecting to it?" the defendant answered "Yes." When opposing counsel recast the question, "You felt that they were permitting you to use the property?" he responded, "No, I can't answer that question. I'd have to say no." Then, after opposing counsel said, "So they are permitting you to use it in that manner . . . ," the reply was, "Yes, by — but not by any awareness, necessarily, of it." Question, "But you didn't think you were using it against their wishes, adversely to —"; answer (cutting counsel off), "No, I didn't." Asked by opposing counsel whether in March, 1988, he believed he owned the lot, the defendant said he felt he owned the lot "emotionally." He countered successive questions — "Then you didn't think you owned it" and "So you — in your head, intellectually, you knew you

did not own the property?" — by saying, "I knew nothing of adverse possession."

c. *Listing for sale and defendant's reactions.* In February, 1988, Peck listed the lot for sale with a local real estate agency, asking price $57,500. Learning of this, the defendant became perturbed because he liked the space and also because — the judge could find, although the defendant denied it — he was worried about who might be the next owner.[5] The defendant offered Peck $48,000, then $53,000, and on March 13, 1988, $55,000. On that day, however, the Galvins offered the asking price, and Peck accepted. The defendant offered the same — too late. On March 25, buyer and seller executed the purchase agreement. The defendant on March 28 futilely offered the Galvins $1,000 to buy their rights.

Sometime between the end of March, 1988, and mid-May, 1988, the defendant casually met an attorney at a Burger King restaurant and spoke with him. The attorney suggested he might have a claim of adverse possession. The defendant promptly told the Galvins that he might own the lot. On May 18, the attorney wrote the defendant a letter in one sentence saying he had investigated the question of adverse possession and decided to file suit for the defendant in the Land Court. The defendant routed the letter to the Galvins, and as a result performance of the purchase agreement was aborted.

3. *Adverse possession.* As indicated, a person may secure title by adverse possession although for the full twenty years he had no inkling that he was using another's land. So, too, a person may believe he was using the land in opposition to the record owner, and yet fail in a suit for title. The point is nicely illustrated by some of the boundary cases. See the discussion in *Kendall* v. *Selvaggio*, 413 Mass. 619, 623-624 (1992).

---

[5]A neighbor testified to a conversation with the defendant, after Peck's lot was offered for sale, in which the defendant proposed to split the purchase price of the lot with him so that they might keep undesirable individuals out of their neighborhood. The defendant vehemently denied having such a conversation.

Passing, then, to the acts of the present defendant on the land — the crux — we conclude that, taking even an indulgent view, he failed to carry his burden of proving his "actual" or "exclusive" use in the sense of the doctrine of adverse possession.

As to actual use, "[a] judge must examine the nature of the occupancy in relation to the character of the land." *Kendall*, 413 Mass. at 624, citing *Ryan* v. *Stavros*, 348 Mass. 251, 262 (1964). See also *Kershaw* v. *Zecchini*, 342 Mass. 318, 320 (1961). Did the actor make "changes upon the land" that constitute "such a control and dominion over the premises as to be readily considered acts similar to those which are usually and ordinarily associated with ownership"? *LaChance* v. *First Natl. Bank & Trust Co.*, 301 Mass. 488, 491 (1938). See also *Lyon* v. *Parkinson*, 330 Mass. 374, 379-380 (1953); *Kershaw*, *supra* at 319-321; *Collins* v. *Cabral*, 348 Mass. 797, 797-798 (1965); *Shaw* v. *Solari*, 8 Mass. App. Ct. 151, 157 (1979); *Lebel* v. *Nelson*, 29 Mass. App. Ct. 300, 301-302 (1990); *Masa Builders, Inc.* v. *Hanson*, 30 Mass. App. Ct. 930, 930 (1991).

The defendant made no permanent improvements on the lot, like the stone walls in *LaChance* and *Kershaw*, the rock garden and rip-rap in *Lyon*, the septic tank in *Collins*, or the house in *Kershaw*. He did at various times put a picnic table, lounge chairs, a swing, a sandbox, and clotheslines on the lot, but these items were not attached to the land and would be and were removed with ease. Nor did the defendant make any significant changes to the land itself, like the filling in *LaChance*, the construction of the driveway in *Masa Builders*, or the transformation of whole tree- and brush-covered parcels into lawns, as in *Lyon*, *Collins*, *Shaw*, and *Lebel*, or cleared areas, as in *Kershaw* and *Shaw*. Nor did he utilize the land as a parking area for automobiles or boats, as in *Shaw*, *Lebel*, and *Masa Builders*. Nor did the defendant ever pay taxes on the lot, as did the predecessor of the successful adverse possessor in *Kershaw*. Peck's regular tax payments over a period of nearly thirty years to 1990 make strongly against the defendant's claim — especially so, where the de-

fendant claims the whole lot, not just part of it. See *Bernard v. Nantucket Boys' Club*, 391 Mass. 823, 826 (1984), and cases cited.

To be sure, the defendant did engage in a few activities that courts have counted toward adverse possession: building a henhouse (*LaChance* and *Shaw*), discouraging trespassers (*Lyon*), and holding family picnics (*Collins* and *Lebel*). In those cases, however, the activities were associated with others which together showed "control and dominion."

The record is perhaps less clear, but still clear enough, that the defendant failed in proof of exclusive use, a further prerequisite to a conclusion of adverse possession (see note 4). Such use must encompass a "disseisin" of the record owner. See *Sparhawk v. Bullard*, 1 Met. 95, 100 (1840); *Curtis v. Brown*, 219 Mass. 157, 159 (1914). And this means exclusion not only of that owner but of all third persons to the extent that the owner would have excluded them. See *Bond v. O'Gara*, 177 Mass. 139, 143-144 (1900); *Leavitt v. Elkin*, 314 Mass. 396, 399 (1943). On the best view of the matter from the defendant's side, it appears there was enough traffic over the rugged lot to repel any conclusion of exclusivity over two decades on his part.[6]

4. *Tortious interference.* The defendant's confidence or lack of confidence in his claim of adverse possession is held not to be a factor in deciding whether his claim was valid. But the question of the defendant's confidence in that claim, his good faith in asserting it, is crucial on the further issue of wrongful interference with the plaintiffs' purchase agreement. See *G.S. Enterprises, Inc. v. Falmouth Marine, Inc.*, 410 Mass. 262, 272-273 (1991).

The trial judge found forcefully that "Bigelow's actions indicate that he knew he did not own the property or have a right to the property." And again, "he never thought he legally owned the property. [He] did not believe that he was using the property adverse to the interests of the owner. He

---

[6]"Acts of enclosure or cultivation are evidence of exclusive possession," see *Labounty v. Vickers*, 352 Mass. 337, 349 (1967), and here there were none.

stated that the owner was permitting his use of the property."

That the defendant offered repeatedly to buy the lot from Peck may not in itself show conclusively that he believed he did not own it, see *Lebel*, 29 Mass. App. Ct. at 302, but the judge could find in the circumstances that it was probative of that proposition. See *Warren* v. *Bowdran*, 156 Mass. 280, 283 (1892). So also the judge could read the direct colloquy between the defendant and opposing counsel about the defendant's state of mind as tending to show that he lacked any reasonable belief in the validity of his claim. A client may base a good faith belief on the advice of counsel, see *G.S. Enterprises, Inc.*, 410 Mass. at 275, but in the present context the short letter from the newly found attorney could fairly be judged by the trier as having been no more than a tactical means of hindering the plaintiffs' transaction and thereby freezing the status quo or possibly enabling the defendant to supersede the Galvins as buyer. See Restatement (Second) of Torts § 676 comment c (1977). The attorney in fact did not commence the threatened Land Court action, and the defendant's counterclaim in the present action can again be seen as a tactical retaliatory response to the main action, which in the end, however, has not resulted in a standoff of liability.

Insofar as the defendant's credibility might be implicated in the judge's appraisal, one turns particularly to the places in the record where the defendant's testimony conflicts with the testimony of others. A trier could find that the defendant's reliability was put in some question: consider, for example, the defendant's heated denial of the conversation with his neighbor, and his contradicted testimony that there were cleared paths on the property continuously from 1936 to date.

We conclude that the judge's view of the interference claim was well supported and surely not "clearly erroneous." See Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974).

As to the plaintiffs' contention that the judge erred in his assessment of the amount of damages, we hold that there has

been no abuse of discretion. On that issue, "[o]nly in rare instances can it be ruled that there has been an abuse of discretion amounting to an error of law." *Pemberton* v. *Boas*, 13 Mass. App. Ct. 1015, 1018 (1982), quoting from *Bresnahan* v. *Proman*, 312 Mass. 97, 101-102 (1942).

*Judgment affirmed.*