CATHERINE E. CONTE, trustee,[1] *vs.* MARINE LUMBER COMPANY, INC. (and a companion case).[2]

No. 04-P-1543.

Suffolk. September 14, 2005. - June 13, 2006.

Present: ARMSTRONG, C.J., RAPOZA, & DOERFER, JJ.

*Adverse Possession and Prescription. Real Property,* Adverse possession. *Estoppel. Deed,* Quitclaim.

The Land Court judge properly determined that the plaintiff held a clear record title to a particular lot of land, where the record did not support the defendant's claim that a predecessor in interest had established adverse possession of the lot, in that there was no evidence that the predecessor's activities were conducted on the lot, as opposed to other areas of a larger parcel that included the lot [508-511]; where the failure of the adverse possession claim meant that the defendant's claim of estoppel by deed also failed, because the defendant's immediate predecessor in interest, in conveying to the defendant via a quitclaim deed whatever title that he himself had, committed no breach of warranty [511-513]; and where there was no basis for finding that the doctrine of equitable estoppel applied [513-514].

CIVIL ACTION commenced in the Land Court Department on November 9, 2001.

CIVIL ACTION commenced in the Land Court Department on January 2, 2003.

The cases were heard by *Alexander H. Sands*, J.

*Robert F. Daut* for the defendant.

*Jonathan W. Fitch* (*Jennifer E. Greaney* with him) for the plaintiff.

ARMSTRONG, C.J. South of the town of Nantucket,[3] in the direc-

---

[1]Of Cassidy Family Trust.

[2]Marine Lumber Company, Inc. *vs.* Catherine E. Conte, trustee.

[3]By "town" we mean the historic district. The "Town of Nantucket" in the political sense encompasses the entire island of Nantucket.

tion of Miacomet Pond, in an acute angle formed by the junction of Somerset Road and Marble Way, lies a one-half acre, triangular-shaped parcel of land in dispute between the parties, known to them as "lot 5." The judge, after hearing the evidence, rejected the various claims of Marine Lumber Company, Inc. (Marine Lumber), to hold an interest in lot 5 though adverse possession, estoppel by deed, or equitable estoppel, and ruled that Catherine E. Conte, as trustee for the Cassidy Family Trust (trust), had a clear record title to the disputed lot 5. Marine Lumber has appealed.[4]

Marine Lumber's connection to the lot arose in 1987 when William P. Cassidy, Jr. (hereinafter, W. Cassidy), being indebted to Marine Lumber for $39,650, gave Marine Lumber a promissory note in that amount secured by a mortgage of his interest in lot 5. Three years later, W. Cassidy, in default on the note and facing foreclosure on the mortgage, gave Marine Lumber a quitclaim deed of his interest in the lot in lieu of foreclosure.[5] His interest in the lot was based on a quitclaim deed of the lot from his grandmother, Mary Cassidy, to W. Cassidy and his brother Padraic Cassidy as tenants in common, which was dated November 27, 1987.

Marine Lumber concedes that Mary Cassidy, at the time of the deed to her grandsons, did not have record title to the parcel, which was held by Norwood Farm Trust. Marine Lumber instead argues that she had a valid claim to title tracing back to an adverse possessor, one Gilbert Burchell, who, according to Marine Lumber's claim, used lot 5 continuously, openly, and

---

[4]The appeal before us is from judgments in two cases in the Land Court, one brought by the trust, to quiet its title to lot 5, and one by Marine Lumber, for a judgment declaring that it is the owner of lot 5 by adverse possession, estoppel by deed, or equitable estoppel. A third case, a petition by one Edward Burchell for registration of a seventeen-acre parcel between Somerset Road and Marble Way that included lot 5, was in part tried together with the first two cases because it involved in part the dispute concerning ownership of lot 5. The registration petition is not before us.

[5]The deed stated, "This conveyance is made subject to [the Marine Lumber mortgage]. . . . The said mortgage . . . is now merged with the title by reason of this deed in lieu of foreclosure." The effect of the transaction was to extinguish the mortgage such that Marine Lumber's claim in this case concerns only its rights under the quitclaim deed. See Eno & Hovey, Real Estate Law § 9.5 (4th ed. 2004).

adversely for twenty-one years, in the circumstances next described.

In 1939, a couple named Williams conveyed to Gilbert Burchell and his wife Isobel Burchell by deed a parcel of several acres that lay between Somerset Road and Marble Way, somewhat to the east of the disputed lot 5 (Williams land). In 1958, the Burchells were deeded a small working farm (Esau farm) that lay just to the east of the Williams land. Between 1939 and 1961, when he divorced Isobel and moved to Florida, Gilbert Burchell used the land between Somerset Road and Marble Way for his businesses. Foremost was his rubbish business; he would collect garbage and bury it on the land. He stripped trees from the land and planted rye grass, both to attract deer — he was a hunter — and to plow under for the purpose of enriching the soil. He supplied loam throughout Nantucket and, at times, maintained cemeteries, using some of his loam for grading and planting new graves. Gilbert Burchell may have had other lots on the island; one Henry Garnett, who used to work for Gilbert Burchell, testified (by deposition) to burying Siasconset garbage on land nearby. So far as the record shows, the land that Gilbert Burchell was deeded and whatever adjacent land he may have used for the purposes described were not, except for the Esau farm,[6] the site of a home or buildings, nor were they fenced in.

In 1961, when he left Nantucket, Gilbert Burchell conveyed "all his property in Nantucket" to Isobel, who in 1973 deeded to their son Edward Burchell and one Donald Visco a portion of the land between Somerset Road and Marble Way claimed to have been worked from 1939 to 1961 by Gilbert Burchell. The portion included what became lot 5; it carried that designation on a 1973 plan bearing an endorsement by the planning board that approval under the subdivision control law was not required.[7] Shortly thereafter, Edward Burchell and Donald Visco conveyed the land to Mary Cassidy, who in 1975 conveyed

---

[6] In 1963, Edward Burchell, the son of Gilbert and Isobel, burned down a house and outbuildings on the Esau farm that had fallen into disrepair and were being vandalized by trespassers.

[7] The plan was prepared by John J. Shugrue and is dated September 15, 1973. The planning board endorsement was dated September 17, 1973.

most of the land, including lot 5, back to Edward Burchell subject to an agreement that he would reconvey the land to her either on demand or on his succeeding in having the land registered. In June, 1977, Edward Burchell filed in the Land Court a petition for registration of a parcel of land between Somerset Road and Marble Way, comprising in the order of seventeen acres,[8] the southwest corner (or triangle) of which was the disputed lot 5. In 2001, while the petition for registration was still pending, Edward Burchell purported to convey the entire seventeen-acre registration parcel (Burchell property or registration parcel) to a real estate trust, Blackfin, LLC (Blackfin), the two principals of which were W. Cassidy and J. Daniel Lugosch III.[9] The deed recognized that the Burchell property was comprised of parts for which Edward Burchell's ownership was deeded and parts for which Edward Burchell's claim to ownership was grounded in adverse possession. Independently, Blackfin purchased from Norwood Farm Trust, record owner of lot 5, all parts of Edward Burchell's seventeen-acre registration parcel to which the Norwood Farm Trust held record title. Thereafter, Blackfin conveyed to Conte as trustee of the trust a portion of the seventeen-acre registration parcel that included lot 5.

*Adverse possession.* The two tracts deeded to Isobel and Gilbert Burchell, the Williams land and Esau farm, together accounted for only about ten of the more than seventeen acres claimed by Edward Burchell in his registration petition. More than seven acres, including lot 5, were based on the claim that Gilbert Burchell had used the land in his business from 1939 to 1961, when he deeded all his land in Nantucket to Isobel Burchell and moved to Florida. The claim was that by his "nonpermissive use which [was] actual, open, notorious, exclusive and adverse for twenty years," *Ryan* v. *Stavros,* 348 Mass. 251, 262 (1964) — that is, the period from 1939 to 1961 — Gilbert

---

[8]This parcel included the Williams land, the Esau farm, and lands south and west of those parcels between Somerset Road and Marble Way. The seventeen-acre parcel was roughly triangular in shape, with lot 5 constituting the apex at the junction of the two roads.

[9]The membership percentage interests were stated to be fifty percent in W. Cassidy, forty-five percent in Lugosch, and five percent in one Jay W. Wertheimer.

Burchell had by operation of the Statute of Limitations barred recovery of the property by record owner or owners.[10]

To succeed in acquiring possession through adverse use, "[t]he nature [of the required use varies] with the character of the land." *LaChance* v. *First Natl. Bank & Trust Co.*, 301 Mass. 488, 490 (1938). As to a wild or wooded area, the general rule, as the judge recognized, is that a finding of adverse use will not succeed if the area is unenclosed or uncultivated. "[M]erely cutting wood and timber from wild land, and clearing and cultivating a part of it, are no proof of a disseisin beyond that part." *Morris* v. *Callanan*, 105 Mass. 129, 133 (1870). Here the testimony was that Gilbert Burchell stripped some areas of trees, buried rubbish, and planted rye grass both to attract deer and to plow under to enrich the soil. He dug loam from some parts. For purposes of decision we can assume that such activities could, with continuity and notoriety, suffice in intensity to qualify for adverse possession despite the lack of fencing or the construction of buildings. The problem with Marine Lumber's claim is that it failed to persuade the judge that those activities were conducted on lot 5 specifically, as contrasted with other areas of the registration parcel.

The evidence did not require the judge to find otherwise. The most specific evidence presented of the location of the activities was in the form of two videotaped depositions taken in 1995. The deponents, both deceased by the time of the trial in March, 2003, were Edward Burchell, born in 1942, three years after the start of the alleged twenty-one year period of adverse use; and Henry Garnett, who was born in Nantucket in 1919 and worked

[10]If the adverse possession claim had been upheld as applied to the disputed property, lot 5 would have passed from Gilbert Burchell to Isobel Burchell in 1961, to Edward Burchell and Donald Visco in 1973, later in 1973 to Mary Cassidy, then to Edward Burchell subject to the agreement in 1975, then to Isobel Burchell and Barbara MacLean in 1977, again expressly subject to the agreement in favor of Mary Cassidy, then (ignoring the 1977 deed by which Isobel Burchell and Barbara MacLean had purported to return the land to Edward Burchell) in 1979 to Stanley Cassidy and Maria Senecal as tenants in common. Stanley Cassidy's one-half interest then passed back to Mary Cassidy in 1984, who then held record ownership of a tenancy in common with Maria Senecal, whose interest was subject to Mary Cassidy's beneficial interest. In 1987, Mary Cassidy passed her interest to W. Cassidy and Padraic Cassidy as tenants in common, and later that year W. Cassidy passed his interest to Marine Lumber by mortgage and in 2000 by deed in lieu of foreclosure.

for Gilbert Burchell for many years. Apart from instances of Garnett pointing to a plan dated 1995 to show where the various activities were conducted, which are blind references in the record before us, the testimony of Garnett supported the judge's finding that the loam removal and rubbish burying activities took place in the central area of the 1995 plan along the fence that divided the land Gilbert Burchell was working from the Esau farm; and that the rye grass planting and hunting activities were concentrated in the center of the area on the 1995 plan (i.e., the areas south and west of the Esau farm) and not on lot 5 (in the extreme southwest corner of the area shown on the 1995 plan).[11] In a 1990 affidavit that Garnett had reaffirmed in his deposition, Garnett had stated, "I recall that from about 1939 to about 1961 he [Gilbert Burchell] continuously used all of the land shown on the plan and southwesterly of the Esau farm for his business." The judge, exercising the proper prerogative of the fact finder, declined to weigh that general statement more heavily than the more location-specific answers Garnett gave in deposition.[12]

All in all, Marine Lumber, relying on a variety of alleged

---

[11]The judge's finding stated: "From 1939 through 1961 . . . , [Gilbert] Burchell ran a rubbish business in a portion of the [land shown on the 1995 plot] which did not include Lot 5. At some point after 1939, but during the period ending 1961, [Gilbert] Burchell also ran a loam business in a portion of the [land shown on the 1995 plot] which did not include Lot 5. [Gilbert] Burchell and/or his employees would bury rubbish with hand shovels and cover it with loam. Employees would remove the loam from the portion of the Property abutting Marble Way, working from the Fence Wire and moving northwesterly towards Somerset Road as more loam was needed. . . . During the Adverse Possession Period, [Gilbert] Burchell grew rye somewhere in the middle portion of the Property (which did not include Lot 5) for deer hunting purposes and for improving the condition of the soil for loam purposes."

[12]Not reaffirmed in the 1995 deposition was another statement in the 1990 affidavit: "[Gilbert Burchell] grew rye on the land, from the fence along the boundary of the Esau farm to the intersection of Somerset Road and Marble Way." The affidavit itself was not put in evidence. In the deposition, Garnett was asked to "show approximately on the plan where [Gilbert] Burchell grew the rye." The transcript continues: *A.* "Down below the section down in here . . . [pointing]." *Q.* "You just pointed to approximately the center section of —" *A.* "Yeah. Yeah." *Q.* "— the property?"

Other affidavits, those of Lawrence Ellis and Walter Barrett, were executed the same day as the affidavit of Garnett, and included the same language, verbatim, as that used in the Garnett affidavit: "I recall that from about 1939 to about 1961 he continuously used all of the land shown on the plan and

uses many years before trial that left no permanent traces on the ground, and on affidavit and deposition testimony that was not compelling in defining the precise location where activities took place or the precise times as to such activities, presented a thin case for a finding of continuous, adverse possession for the requisite period. The judge cannot be faulted for declining to find that Marine Lumber had title by adverse possession.

*Estoppel by deed.* The rejection of the adverse possession claim requires a conclusion that no interest in lot 5 passed through the chain of conveyances beginning with Gilbert and Isobel Burchell, the chain that included the deed of lot 5 by Mary Cassidy to her grandsons W. Cassidy and Padraic Cassidy, and the deed of lot 5 from W. Cassidy to Marine Lumber. Citing *Zayka* v. *Giambro*, 32 Mass. App. Ct. 748, 752-753 (1992), however, Marine Lumber argues that the deed last mentioned — W. Cassidy to Marine Lumber — acts to estop W. Cassidy from raising against Marine Lumber any actual title to lot 5 that he should thereafter acquire from the true owner. As applied to this case, Marine Lumber argues that Blackfin was a nominal holder of title only, a front for W. Cassidy, and that the conveyance of lot 5 from the true owner, Norwood Farm Trust, to Blackfin was in essence a conveyance to W. Cassidy, with the effect that at the time of that conveyance title inured to Marine Lumber.

The deed from W. Cassidy to Marine Lumber was a quitclaim deed, and Marine Lumber recognizes that, historically, the doctrine of estoppel by deed was limited to warranty deeds. See cases and authorities cited in *Zayka* v. *Giambro*, 32 Mass. App.

---

southwesterly of the Esau farm for his business. He grew rye on the land, from the fence along the boundary of the Esau farm to the intersection of Somerset Road and Marble Way." The affidavits were not mentioned in the trial and were first brought to the judge's attention in the posttrial brief of Marine Lumber. In his decision, the judge ruled: "[T]hese witnesses did not testify at the trial, and the parties did not indicate a reason why these witnesses did not testify. As a result, I do not consider these affidavits to be part of the evidentiary record. Moreover, even if the affidavits were part of the record, they are ambiguous relative to [the] uses of Lot 5."

The judge did consider aerial photographs, which seemed to depict changes on the ground including lot 5. The judge declined to give them decisive weight in the absence of testimony concerning when they were taken and what, specifically, they depicted.

Ct. at 752. Marine Lumber, however, reads our *Zayka* decision as having eliminated that distinction, prompted in part by the fact that quitclaim deeds have largely supplanted warranty deeds in conveyancing practice.

Marine Lumber reads *Zayka* too broadly. It is true that in *Zayka* we applied estoppel to a quitclaim deed, and we pointed out that "no compelling logic or binding precedent proscribes its application to a quitclaim deed" — presumably meaning to the extent that the covenants in a quitclaim deed support the logic of estoppel. *Id.* at 753. "Quitclaim covenants, after all, do warrant that the grantor shall not impair the title and shall defend the title against those claiming under the grantor. See G. L. c. 183, § 17." *Ibid.* Hence, we held that the title given by the father, although by quitclaim deed, operated to estop his daughter from asserting title by inheritance from him. *Id.* at 751. See *Dalessio* v. *Baggia,* 57 Mass. App. Ct. 468, 470-471 (2003).[13]

That principle does not apply to the present case because Blackfin acquired its title to lot 5 not from W. Cassidy, or one claiming under him, but from Norwood Farm Trust, the record owner, who was a stranger to the Burchell-Cassidy-Marine Lumber transactions. In a quitclaim deed, the grantor's covenant "is a restricted covenant . . . . He agrees to warrant the title granted or released, and nothing more. That title only he under[takes] to assert and defend. To extend the covenant further, would be to reject or do away with the restrictive words of it, and to enlarge it to a general covenant of warranty . . . ." *Comstock* v. *Smith,* 13 Pick. 116, 120 (1832). Under the quitclaim deed form, the grantor "[does] not undertake to convey to the [grantee] an indefeasible estate, but only his own

---

[13]The *Zayka* decision is nevertheless anomalous because the grantor under a quitclaim deed conveys only such title as he has at the time of executing the deed. See G. L. c. 183, §§ 11, 17. We analogized the case to *"Trull* v. *Eastman,* 3 Met. 121, 124 (1841), a case involving a family arrangement in which it was understood that the title conveyed was later to be acquired by the grantor from his father's will." *Zayka* v. *Giambro,* 32 Mass. App. Ct. at 753. The *Zayka* decision "turn[ed] not on the formal nature of the covenants but on what is the obvious intention of the parties." *Ibid.* As the son in *Zayka* relied on the father's conveyance in building his house, the *Zayka* decision quite possibly should be regarded as an application of equitable estoppel rather than estoppel by deed.

title, nor [does] he agree to warrant and defend it against all claims and demands, but only against those derived from himself; by which he must be understood to refer to existing claims or [e]ncumbrances, and not to any title which he might afterwards acquire by purchase or otherwise from a stranger." *Ibid.*

The estate that W. Cassidy conveyed to Marine Lumber by a quitclaim deed was a claim of title that had potential value although it ultimately proved unsuccessful. This was not due to any impairment of the title by W. Cassidy or one in privity with him. W. Cassidy gave Marine Lumber just what he promised: the title that he himself had, with no encumbrances created by himself or those claiming through him. There has been no breach of warranty, and no occasion for estoppel by deed.[14] The analysis might be different if Marine Lumber were holding the property under the mortgage deed rather than under the quitclaim deed.[15]

*Equitable estoppel.* Marine Lumber argues, finally, that by operation of the doctrine of equitable estoppel or promissory estoppel, the trust has an obligation to convey to it a fifty percent undivided interest in lot 5, and that the obligation exists regardless whether Marine Lumber's adverse possession claim is sustained. Its reasoning is as follows.

In October, 1975, Mary Cassidy conveyed to Edward Burchell three lots shown on the 1973 plan by John J. Shugrue, lots 5, 7, and 8.[16] The conveyance was made subject to an agreement that was recorded with the deed, which obligated Edward Burchell to reconvey the lots to Mary Cassidy on demand or

---

[14]To quote *Comstock* v. *Smith,* 13 Pick. at 121, "If under these circumstances [Marine Lumber] could now acquire, without any consideration, another [perfect] title by estoppel, we should be compelled to admit that estoppels are as odious as they are sometimes said to be. But the doctrine of estoppel aids much in the administration of justice; it becomes odious only when misunderstood and misapplied."

[15]See note 5, *supra.* The typical mortgage deed, like the one here, carries "mortgage covenants," which are warranty covenants. See *Mt. Washington Coop. Bank* v. *Benard,* 289 Mass. 498, 499 (1935); G. L. c. 183, §§ 18, 19. The focus of the analysis would then turn to whether Marine Lumber carried its burden of proving that Blackfin was in fact the alter ego of W. Cassidy.

[16]These lots, as well as lot 6, had been conveyed by Edward Burchell and Donald Visco to Mary Cassidy in 1974.

when they were registered. In his 2001 deed to Blackfin, Edward Burchell referenced the agreement and made the conveyance subject to the obligation therein contained. As we now know, Blackfin took no interest in lot 5 from Edward Burchell, but rather was conveyed lot 5 by Norwood Farm Trust. Nevertheless, Marine Lumber makes the argument that, by accepting the entire registration tract from Edward Burchell subject to the agreement, Blackfin obligated itself to reconvey to Mary Cassidy or her heirs or successors in title those parts of the registration tract that were subject to the agreement. Lots 5, 7, and 8 were so subject.

For several reasons, the argument is incoherent. To benefit from the agreement, Marine Lumber would have to be a successor in title to Mary Cassidy. In fact, neither had any title whatever in lot 5. Moreover, if Mary Cassidy had taken legal title under the deed from Stanley Cassidy (see note 10, *supra*), the obligation of the agreement, to return the legal title to Mary Cassidy, would have been extinguished as to lot 5 by merger, as Mary Cassidy then had both the legal title and the beneficial rights in the property. Thus, Marine Lumber would have held whatever interest it took in lot 5 free of any obligation under the agreement. This is the same as to say that if Mary Cassidy had received the legal title to lot 5 from Stanley Cassidy, and conveyed, as she did, all her right, title, and interest to W. Cassidy and his brother Padraic, they would have taken the title as a gift, free of any obligation under the agreement to return the legal title to her. Marine Lumber cannot escape this result by arguing that its right arose not from the agreement, but rather from the obligation Blackfin undertook when it accepted the deed from Edward Burchell, because the obligation was only to carry out the terms of the agreement. As applied to lot 5, Mary Cassidy had herself extinguished any such obligation. The judge correctly ruled that there was no basis for finding equitable estoppel.

The judgments of the Land Court determining that lot 5 belongs to the Cassidy Family Trust must therefore be affirmed.

*So ordered.*