STASA vs. PADIS, Jr., MISC 18-000227

































 
 GJERGJI STASA and DENISA STASA, Plaintiffs, v. ALEXANDER A. PADIS, Jr. and KATHLEEN K. PADIS, Defendants
 MISC 18-000227 
 JANUARY 27, 2021
SUFFOLK, ss.
SPEICHER, J.
DECISION














 Alexander Padis and Kathleen Padis live at 534 Centre Street in Milton and access their property by way of a deeded easement for use of the driveway on their next door neighbors' property at 518 Centre Street. The Padises claim that they have acquired title by adverse possession to more than just their neighbors' driveway. The neighbors, Gjergji Stasa and Denisa Stasa, after becoming aware of the Padises' claims, filed this quiet title and declaratory judgment action seeking to quiet their title against the Padises' adverse claims, as well as a declaratory judgment regarding the scope of the deeded easement held by the Padises. In response, the Padises counterclaimed, asserting they had acquired title by adverse possession to approximately 2,500 square feet of the Stasa property. [Note 1] Following the preparation of a plan (Exhibit 9), which showed a fence and concrete slab encroaching on the Padis property (referred to as the small disputed area), the Stasas amended their complaint to add a claim that they and their predecessors in title have established title by adverse possession to the small disputed area at the rear of the Padises' property. [Note 2] In similar fashion, the Padises amended their counterclaim, to include a claim of trespass against the Stasas relative to the small disputed area. 





 I took a view on September 14, 2020, and the case was tried before me over two days from September 15 -16, 2020. Following the filing of post-trial briefs and requests for findings of fact and rulings of law, I took the matter under advisement on October 16, 2020. 





 Based on the findings of fact and rulings of law below, I find and rule that the Padises have failed to prove their counterclaim of adverse possession and that the Stasas are entitled to a judgment quieting their title to the disputed portions of their property and enjoining any trespasses on their property by the Padises. I find and rule that the Stasas have established their claim of adverse possession over a portion of the northwest corner of the Padis property. I further find that both the Stasas and Padises are entitled to judgments enjoining trespasses from the encroachment of a privacy fence and stockade fence supports, respectively, on their properties. 





FACTS 





 Based on the facts stipulated by the parties, the documentary and testimonial evidence admitted at trial, my view of the subject properties, and my assessment as the trier of fact of the credibility, weight, and inferences reasonably to be drawn from the evidence admitted at trial, I make the following factual findings: [Note 3] 





1. The plaintiffs Gjergji Stasa and Denisa Stasa own and reside at the property located at 518 Centre Street in Milton. 





2. The Stasas purchased this property from Nancy Campbell and William Michael Campbell by a deed dated December 20, 2013, recorded in the Norfolk County Registry of Deeds ("Registry") in Book 31978, Page 225. [Note 4] 





3. The Campbells acquired 518 Centre Street by a quitclaim deed dated May 7, 1976, recorded in the Registry in Book 5220, Page 335. [Note 5] The Campbells lived at the property from 1976 until they sold it to the Stasas in 2013. [Note 6] 





4. The defendants, Alexander A. Padis, Jr. and Kathleen K. Padis own and reside at the property at 534 Centre Street in Milton, which is next door to the Stasa property. The Padises acquired their property by a deed dated September 16, 1996, recorded in the Registry in Book 10954, Page 134. [Note 7] 





The Properties and the Revised Disputed Area. 





5. The Stasa property and the Padis property share a common record boundary line, 234 feet in length, which forms the eastern boundary of the Stasa property and the western boundary of the Padis property. The entire southern boundary line of both properties is their frontage on Centre Street. [Note 8] 





6. The Padis property is approximately 40,000 square feet in area and has a steep slope toward the southern boundary line fronting Centre Street and a relatively flat backyard. [Note 9] The lot is improved by a single-family home, the Padis residence, which is surrounded by front, side and backyards landscaped with grass, azaleas and other plants. 





7. The Padis property includes a set of concrete stairs, installed before the Padises took title in 1996. The stairs traverse a steep, unimproved hillside between the flat back portion of the lot and the southern boundary line at Centre Street below. [Note 10] These stairs enable one to walk down from the Padis house to Centre Street without crossing over the driveway on the Stasa property. 





8. The Stasa property is approximately 45,500 square feet in area and is improved by a single-family home and a detached garage. [Note 11] From Centre Street, the property slopes steeply upward, like the adjacent Padis property, with an unimproved hillside area between the southern property line at Centre Street and the relatively flat back portion of the lot where the home is located. [Note 12] 





9. Access to both the Stasa property and the Padis property is obtained by a common driveway on the Stasa property. [Note 13] From Centre Street, the paved driveway extends north approximately fifty feet before reaching a stand-alone, detached two-car garage and parking pad. [Note 14] Past the garage, the driveway curves northeast before diverging, with one arm of the driveway extending north to the Stasa home. Traveling past the driveway split toward the Stasa residence, one would see the Stasa home on the left (to the northwest on the Stasa property) and a row of arborvitae trees to the right (closer to the Stasa/Padis record boundary line). [Note 15] 





10. Where the driveway diverges, the lower arm of the paved driveway continues northeasterly, transitioning to gravel toward the Padis property (this part of the driveway is referred to by the parties as the "neck"). The driveway extends across the Stasa/Padis boundary line and onto the Padis property, first opening into a gravel-surfaced circle, presumably for vehicles to park and maneuver, and then continuing northeasterly to the Padis home. [Note 16] The paved portion of the driveway ends, and becomes a gravel surface, just west of the boundary line, so that a small portion of the driveway on the Stasa side of the boundary has a gravel surface. [Note 17] 





11. The Padises' legal access to utilize the Stasa driveway is governed by a Confirmatory Easement and Grant of Easement dated October 1, 1982, and recorded with the Registry in Book 6057, Page 367. By this document, the Campbells confirmed an earlier, 1976 easement, and granted to the Padises' predecessor in title an easement "for the ingress and egress of the Grantees and their motor vehicles...to and from Centre Street..." The grant provides that "[t]he granting of said easement shall in no way abridge or interfere with the use of the same area by the Grantor." The grant further allowed the grantor and the grantor's successors to relocate the easement in the future, provided proper instruments documenting any such relocation are recorded at the Registry. [Note 18] 





12. Where the driveway splits, going off to the north to the Stasa home and northeasterly to the Padis home, is an unpaved circle surfaced by dirt, some grass, and simple ground cover, referred to by the parties as the "point." Past the point to the north, and on the record property of the Stasas, is a row of mature arborvitae trees that extends approximately fifty feet running diagonally to the northeast, flanking the upper Stasa driveway immediately to the west. The area around the arborvitaes is partially landscaped with sparse grass and plantings (also referenced as the "strip"). [Note 19] The strip is bounded by the arborvitaes and the lower leg of the Stasa driveway. [Note 20] 





13. The large disputed area to which the Padises claimed ownership by adverse possession totaled +/- 2,521 square feet and included the arborvitaes, a sliver of the point, the "strip" (the partially landscaped stretch between the arborvitaes and the paved driveway included in the easement, as well as a portion of the unimproved, wooded hillside from the paved driveway to Centre Street. [Note 21] 





14. In their post-trial brief, the Padises announced that "despite the fact that they believe that all of their claims presented to the Court are arguable, [they] have decided to proceed on only the claim that is most important to them. Therefore...they relinquish their claim for adverse possession..." for part of their counterclaim. [Note 22] In their counterclaim as revised, the disputed area (the "revised disputed area") consists of the area between the arborvitae trees that runs diagonally northeast along the upper Stasa driveway to the record boundary line, and the edge of the lower paved driveway that is part of the driveway easement (the "neck"). The revised disputed area consists of a stretch of patchy grass and small brush (referred to as the "strip"). [Note 23] The revised disputed area also includes the section of driveway that has a gravel surface and is on the Stasa property, that is, the part of the driveway on the Stasa property between the pavement and the property boundary. [Note 24] 





15. In 1984, the Campbells, predecessors in title to the Stasas, planted a row of arborvitaes on the Stasa - then Campbell - property, delineating what is now one boundary of the disputed area above the driveway. [Note 25] I credit the testimony of Mark Campbell and Christopher Campbell that the arborvitae trees were planted by their uncle, who owned a landscaping business. [Note 26] Christopher Campbell further testified that the arborvitaes were planted around the time the driveway was repaved, for the purpose of providing privacy screening between the Stasa property and Padis property. [Note 27] I credit this testimony. Accordingly, I find that the arborvitaes were present at the time the Padises took title in 1996, and that they were planted by the Campbells, and not by the Padises' predecessor in title. 





16. There are numerous azaleas on both the Stasas' and the Padises' properties. [Note 28] The Campbells planted and maintained the azaleas in and around the Stasa - then Campbell - property, including along the driveway and in the revised disputed area near the arborvitaes. [Note 29] There was no evidence to suggest, nor do I find, that any of the azaleas on the Stasa property were planted or maintained by the Padises or their predecessors in title. 





Small Disputed Area and Privacy Fence. 





17. A second disputed area, located on the rear of the Padis property, is the subject of an adverse possession claim raised by the Stasas and a counterclaim of trespass by the Padises. [Note 30] This area is near the rear of the two properties and is defined by a stockade fence and a concrete pad installed by the Campbells. The Campbells installed a concrete pad in 1978 and a wooden stockade fence in 1988 in the northeast, rear corner of the Stasa property. [Note 31] As shown on Exhibit 9, the stockade fence continues over the shared boundary line, encroaching on the northwest corner of the Padis property. The stockade fence intersects the Stasa/Padis boundary line at an angle, such that the area of encroachment on the Padis record property is triangular in shape. The depth of the encroachment is 8.5 feet at the widest point (what would be the base of the triangle) along the northern boundary line of the Padis property. The depth of the encroaching area decreases along the length of the stockade fence, 49.72 feet. The concrete pad encroaches on the Padis property by several feet (the exact dimensions are not disclosed) near the apex of the fence encroachment. [Note 32] 





18. The Padises have effectively conceded on their counterclaim of trespass as to the small disputed area. During the trial, counsel for the Padises acknowledged that the fence and concrete pad, which is partially on the Padis property, have "been there long enough for [the fence and the concrete pad] to be considered part of petitioners' property." [Note 33] 





19. On or about November, 2016, the Padises gave the Stasas permission to erect two wooden supports on the Padis property to shore up the leaning stockade fence. [Note 34] Permission was subsequently revoked pursuant to a letter from the Padises' counsel to the Stasas' counsel dated February 13, 2019. [Note 35] The fence supports remain on the Padis property today, and are the basis for the Padises' remaining counterclaim for trespass. [Note 36] 





Activities and Use on the Revised Disputed Area. 





20. From September, 1996 through October, 1997, Mr. Padis personally performed yard maintenance in the disputed area, including mowing grass and raking leaves between the paved driveway and the arborvitaes in the disputed area. [Note 37] Mr. Padis further testified that he would dispose of the grass clippings and leaves on the unimproved portion of the disputed area south of the driveway (now "relinquished" by the Padises). To the extent these activities were performed by Mr. Padis, I credit this testimony. 





21. Mr. Padis also testified that from October, 1997 to approximately October, 1998 his agent, Tom O'Connor, conducted landscaping services including mowing grass and raking leaves on the Padis property as well as on the disputed area. [Note 38] Mr. Padis further testified that from 1999 to 2018, his landscaper, Mark Kelly, performed seasonal yard maintenance, which also included mowing the grass and raking leaves along the strip and around the arborvitaes within the disputed area. [Note 39] I do not credit this testimony regarding work performed by Mr. O'Connor or Mr. Kelly as to activity in the disputed area. Mr. Padis, who was away at work during the day when this work was performed, [Note 40] did not testify to personally observing Mr. O'Connor or Mr. Kelly mowing grass or raking leaves on this area but rather claims to have seen the finished work product - cut grass [Note 41] and raked leaves. [Note 42] He hired these landscapers to maintain his property as a whole, and not the disputed area in particular. (The Campbells also testified to mowing grass and otherwise maintaining the large disputed area - see infra.) Given that Mr. Padis did not personally observe the work he claims his hired landscapers performed in the large disputed area, and given the competing testimony of the Campbells, which I credit, that they also mowed grass and did other landscaping chores in the disputed area, I draw no inference that the Padises' landscapers mowed or performed other landscaping services in the large disputed area. 





22. Mr. Padis testified that every winter starting in 1996, he tended to the arborvitaes by knocking snow off of the trees to prevent damage from top-heavy branches. [Note 43] He continued this activity through the winter of 2018, stopping when this dispute was filed in May, 2018. [Note 44] I credit this testimony. 





23. Mr. Padis also testified to removing two damaged arborvitaes and planting a new replacement arborvitae in the row of trees. In April, 2013 Mr. Padis removed two damaged arborvitaes, one uprooted and one snapped at the base, ultimately disposing of the damaged trees and stump on the unimproved, wooded hillside (formerly part of the large disputed area). [Note 45] Mr. Padis purchased a new arborvitae in May, 2013, which he planted to replace the two removed specimens among the row of arborvitaes. [Note 46] I credit this testimony. 





24. Mr. Padis testified that on one occasion he placed a heavy rubber band around two arborvitaes closest to the point to provide added support. [Note 47] I credit this testimony. 





25. Mr. Padis also testified that he observed his wife, Kathleen Padis, plant hostas on the grassy point near the disputed area, and that he assisted her with this activity. [Note 48] I credit this testimony. I also credit the testimony of Christopher Campbell acknowledging the hostas planted by the Padises on the point (just outside the disputed area) [Note 49] and the testimony of Mark Campbell regarding hostas planted by the Padises along the driveway in the lower disputed area (excluded from the revised disputed area). [Note 50] I further credit the testimony of Mark Campbell, that on one occasion, he destroyed the hostas with his rider mower in the lower disputed area (no longer relevant to the revised disputed area). [Note 51] 





26. I credit the testimony of both Mark Campbell and Christopher Campbell that the large disputed area was maintained by the Campbells regularly from 1976 through 2013. Mark Campbell testified that annually, he removed undergrowth and raked in and around the arborvitaes, and added mulch to prevent weeds. [Note 52] Mark Campbell testified that he maintained both sides of the arborvitaes, the side of the arborvitaes facing the Stasa - then Campbell - residence, and the side including the strip within the revised disputed area. [Note 53] I credit this testimony. 





27. Mark Campbell further testified that he would knock snow off of the arborvitaes with a rake, and that on a few occasions (four to five times over the years), he trimmed and cut the arborvitaes within the disputed area, to prevent them from becoming top heavy and snapping. [Note 54] Christopher Campbell testified to the same - routine maintenance in the disputed area in and around the arborvitaes was performed by members of the Campbell family through the duration of their ownership of the property. [Note 55] I credit this testimony. 





28. I find that Mark Campbell's further activities included mowing grass along the Stasa - then Campbell - front yard, mowing grass along the driveway and installing plantings at the point, part of which is in the larger disputed area. [Note 56] 





29. Mark Campbell also testified that he raked leaves that were then discarded on the unimproved side of the lower disputed area closest to Centre Street. I credit this testimony. [Note 57] 





30. Gjergji Stasa began maintaining the larger disputed area after moving into the newly constructed Stasa home in 2015. [Note 58] On two occasions, Mr. Stasa raked and blew leaves out from under the arborvitaes in 2015 and disposed of the leaves and debris on the unimproved side of the disputed area. [Note 59] In March, 2016, Mr. Stasa installed fertilizer spikes near the roots of the arborvitaes. [Note 60] I credit all of these assertions by Mr. Stasa. 





31. In 2006, Mr. Padis affixed a house number sign displaying "534" to a tree along the driveway on the unimproved, downhill side of the large disputed area (in part of the area now "relinquished" by the Padises). [Note 61] In 2007, Mr. Padis affixed a second sign displaying "welcome" to the same tree. [Note 62] These signs remained until the tree died in 2013, after which, Mr. or Mrs. Padis relocated the signs to a different tree that was closer to the Padis record boundary line, but still within the large disputed area. [Note 63] Mr. Padis testified that seasonal decorations were placed at various locations in the disputed area from 1996 through 2018. [Note 64] In some of those years, seasonal holiday decorations were situated in front of the arborvitaes on the "point" just outside of the disputed area near where the driveways diverge. [Note 65] The Campbells acknowledged the existence of Christmas decorations during one year, 2004, [Note 66] at which time they unilaterally removed them - disposing of a Christmas wreath and returning other de corations to the Padis front yard. [Note 67] Thereafter, the Padises placed seasonal decorations on the unimproved hillside south of the driveway which is no longer included in the disputed area. [Note 68] I credit that this activity occurred and involved at least some entry onto the disputed area, but I specifically find that such use was sporadic, intermittent and non-possessory in nature. 





32. In approximately March or April 2018, Mr. Padis installed a stockade fence measuring eight feet long by six feet high (the "privacy panel" or "privacy fence") on the Stasa property. The privacy panel is located past the row of arborvitae trees, northeasterly toward the record boundary line. [Note 69] By a letter dated April 9, 2018, the Stasas, through their counsel, requested the Padises remove the privacy fence. [Note 70] In response, the Padises, through their counsel, informed the Stasas that they would not remove the privacy fence and would seek damages if the Stasas removed it themselves. [Note 71] 





Use of the Driveway. 





33. The Padises claim that they have acquired additional easement rights, by prescription, on the driveway, by using it for purposes other than for ingress and egress to Centre Street. Specifically, Mr. Padis testified that from April, 1999 to January, 2014, and again from about a month later on February 1, 2014 through and beyond the initiation of this dispute in May, 2018, [Note 72] he walked one or more of the Padis family dogs along the driveway, at times walking only a portion of the driveway. [Note 73] I find this testimony to be credible. 





34. There is conflicting testimony regarding the frequency with which Mr. Padis engaged in dog-walking along the driveway. Mr. Padis testified that he walked along the paved driveway two to four days per week, [Note 74] and with increased regularity after purchasing a dog in April, 1999 through May, 2013, a period during which he owned several different dogs. [Note 75] Mr. Padis further testified that this activity increased to three times per day after he closed his outside office and began working from home in June, 2013 through May, 2018 when this dispute arose. [Note 76] Although Mark Campbell testified that he never observed Mr. Padis walking dogs along the driveway, [Note 77] Christopher Campbell testified that he observed Mr. Padis walking a dog along the driveway "a few times." [Note 78] Mr. Stasa similarly testified to observing Mr. Padis walking his dog and standing in the driveway. [Note 79] To the extent there is conflicting testimony on this matter, and no further evidence in the record, I find that Mr. Padis engaged in dog walking along the driveway with at least some regularity during this period. 





35. Mr. Padis testified that on at least one occasion, he placed a chair on the "point" for the purpose of reading a book. [Note 80] First, only a sliver of the point, likely too small to accommodate a chair, is even included in the large disputed area, and therefore this information is not relevant to the remaining claims and defenses. [Note 81] Relevance aside, I do not credit the testimony that the owner of a one-acre lot with front, back, and side yards would carry and place a chair on a patch of grass and dirt halfway down the driveway to where the two driveways diverge. I do not credit Mr. Padis's testimony in this regard, and even if credited, the activity was outside the disputed area (as originally claimed and as revised) and was in any event, intermittent and sporadic at best. 





DISCUSSION 





 "Title by adverse possession can be acquired only by proof of non-permissive use which is actual, open, notorious, exclusive, and adverse for twenty years." Ryan v. Stavros, 348 Mass. 251 , 262 (1964). The "necessary elements of such possession [include] the obligation to show that it was actual, open, continuous, and under a claim of right or title." Mendonca v. Cities Service Oil Co. of Pa., 354 Mass. 323 , 326 (1968), quoting Holmes v. Johnson, 324 Mass. 450 , 453 (1949). The burden of proving each element falls upon the party claiming title by adverse possession. Lawrence v. Town of Concord, 439 Mass. 416 , 421 (2003). "The acts of the wrongdoer are to be construed strictly and the true owner is not to be barred of his right except upon clear proof." Tinker v. Bessel, 213 Mass. 74 , 76 (1912), quoting Cook v. Babcock, 65 Mass. 206 (1853). "If any of the elements remains unproven or left in doubt, the claimant cannot prevail." Sea Pines Condominium III Ass'n v. Steffens, 61 Mass. App. Ct. 838 , 847 (2004). 





 "An adverse possession claim requires that possession be 'actual' in nature, meaning that the possessor must be actually utilizing the land that he or she is claiming." Chew v. Kwiatkowski, 19 LCR 88 , 91 (Mass. Land Ct. 2011) (Trombly, J.). To prove actual use, the plaintiff "must establish changes upon the land that constitute 'such a control and dominion over the premises as to be readily considered acts similar to those which are usually and ordinarily associated with ownership.'" Id. 





 In looking to the extent of the claimant's acts upon the land, this showing of dominion and control is closely linked to the requirement that the use be likewise open and notorious. An open use is one undertaken without attempted concealment; to be notorious, "it must be sufficiently pronounced so as to be made known, directly or indirectly, to the landowner if he or she maintained a reasonable degree of supervision over the property." Boothroyd v. Bogartz, 68 Mass. App. Ct. 40 , 44 (2007). Therefore, "[t]he nature of the occupancy and the use must be such as to place the lawful owner on notice that another person is in occupancy of the land, under an apparent claim of right." Sea Pines Condo. III Ass'n v. Steffens, supra, 61 Mass. App. Ct. at 848. Acts under a claim of right are those undertaken "with an intention to appropriate and hold the same as owner, and to the exclusion, rightfully or wrongfully, of every one else." Lawrence v. Town of Concord, supra, 439 Mass. at 421, fn 5, quoting Bond v. O'Gara, 177 Mass. 139 , 144 (1900). [Note 82] "The purpose of the requirement of 'open and notorious' use is to place the true owner 'on notice of the hostile activity of the possession so that he, the owner, may have an opportunity to take steps to vindicate his rights by legal action.'" Id. at 421, quoting Ottavia v. Savarese, 338 Mass. 330 , 333 (1959). 





 The particular acts that would be consistent with ownership, as well as those sufficient to provide notice to the true owner, will vary depending on the features of the land in question, and the court must therefore consider the conjunction of "the nature of the occupancy in relation to the character of the land." Kendall v. Selvaggio, 413 Mass. 619 , 623-624 (1992). "Evidence insufficient to establish exclusive possession of a tract of vacant land in the country might be adequate proof of such possession of a lot in the center of a large city." LaChance v. First Nat'l Bank & Trust Co. of Greenfield 301 Mass. 488 , 490 (1938). Acts of possession which are "few, intermittent and equivocal" do not constitute adverse possession. Kendall v. Selvaggio, supra, 413 Mass. at 624, quoting Parker v. Parker, 83 Mass. 245 , 247 (1861). "[T]he determination whether a set of activities is sufficient to support a claim of adverse possession is inherently fact specific." Sea Pines Condominium III Ass'n v. Steffens, supra, 61 Mass. App. Ct. at 847. 





 Typically, a significant factor considered as demonstrative of actual, open, and notorious use is the erection of significant permanent improvements on the land. See, e.g., Peck v. Bigelow, 34 Mass. App. Ct. 551 , 556 (1993) (noting lack of permanent improvements); Collins v. Cabral, 348 Mass. 797 , 798 (1965) (noting septic tank installation); Shaw v. Solari, 8 Mass. App. Ct. 151 , 154 (1979) (installation of fence and chicken coop). Major alterations to existing features of the landscape itself, such as filling, grading, clear-cutting, or extensive cultivation may serve the same purpose. See Conte v. Marine Lumber Co., 66 Mass. App. Ct. 505 , 509 (2006) (clearing trees, burying rubbish, planting rye grass, and digging loam can together qualify as sufficient use); Hurlbert v. Kidd, 73 Mass. App. Ct. 1104 (Nov. 7, 2008) (Rule 1:28 Unpublished Decision) (finding that permanent structures not necessary where plaintiff parked cars, maintained lawn, pruned trees, and planted vegetation). 





 In contrast, this court has often found that, without such significant improvements or alterations, routine lawn maintenance, with little or nothing more, does not serve to sufficiently exert dominion and control or place the true owner on notice of an adverse claim. See, e.g., Doucette v. Nix, 23 LCR 657 , 663 (Mass. Land Ct. 2015) (Piper, J.) (dog run, occasional storage of equipment, and desultory yard maintenance insufficient to prove adverse possession); Beene v. Silva, 23 LCR 189 , 192 (Mass. Land Ct. 2015) (Long, J.); Berman v. Johnson, 16 LCR 644 , 649 (Mass. Land Ct. 2008) (Long, J.); Frigoletto v. Pirro, 15 LCR 161 , 165 (Mass. Land Ct. 2007) (Long, J.); Cyr v. Burke, 13 LCR 456 , 461 (Mass. Land Ct. 2005) (Lombardi, J.); Courville v. Kohn, 12 LCR 455 , 458 (Mass. Land Ct. 2004) (Lombardi, J.). 





 Nonetheless, the court must consider the nature of the occupancy in relation to the character of the land; thus, in certain circumstances, the peculiar characteristics of a particular area, such as its size (usually its rather small size), may render more routine cultivation and maintenance sufficient despite the lack of accompanying structures or major landscape alterations. Pedonti v. Fantasia, 79 Mass. App. Ct. 1102 (2011) (Rule 1:28 Unpublished Decision) (mowing and cleaning 2.5-foot strip of grass for forty years, in combination with retaining wall and concrete blocks marking disputed boundary, sufficient to show adverse possession); Thomas v. DiPinto, 72 Mass. App. Ct. 1116 (2008) (Rule 1:28 Unpublished Decision) (regular maintenance and mowing of the lawn sufficient where a parcel was not conducive to the construction of a permanent structure or fence, was ideally suited as an "edge or border" lawn area, was already framed on one side by briars and a hedge on another, and was only 163 square feet). 





 Next, the plaintiff must show that his use was exclusive, which requires "exclusion not only of that owner but of all third persons to the extent that the owner would have excluded them." Peck v. Bigelow, supra, 34 Mass. App. Ct. at 557. "Acts of enclosure or cultivation are evidence of exclusive possession." Labounty v. Vickers, 352 Mass. 337 , 349 (1967). 





 For the plaintiff's use to be adverse, there must be a showing of a "lack of consent from the true owner." Totman v. Malloy, 431 Mass. 143 , 145 (2000). "[P]ermissive use is inconsistent with adverse use." Ryan v. Stavros, supra, 348 Mass. at 263. The showing of lack of consent is an objective requirement; the subjective intent of the adverse possessor is irrelevant. "We have long held that the state of mind of a claimant is not relevant to a determination whether the possession of land is non-permissive." Totman v. Malloy, supra, 431 Mass. at 146. 





 Finally, this actual, open, notorious, exclusive, and adverse use must continue uninterrupted for a period of twenty years. See Ryan v. Stavros, supra, 348 Mass. at 262. A grantee of land may, however, tack his possession of a claimed area onto that of his grantor, provided that his predecessor's possession likewise meets all other requirements. See G. L. c. 260, § 22; Haynes v. Boardman, 119 Mass. 414 , 415 (1876). The period of accrual is stopped by the filing of a lawsuit to establish title. See Krieger v. Lanark LJS LLC, 95 Mass. App. Ct. 1111 (2019) (Rule 1:28 Unpublished Opinion), citing Pugatch v. Stoloff, 41 Mass. App. Ct. 536 , 542 fn. 8 (1996). 





I. THE PADISES HAVE FAILED TO CARRY THEIR BURDEN OF ESTABLISHING ADVERSE POSSESSION OVER THE DISPUTED AREA. 





 On the facts as I find them, the Padises have not met their burden of proof to establish their claim of ownership by adverse possession of the disputed area. The evidence falls short of any sufficient showing of occupancy of the disputed area that is continuous for twenty years and is actual, open, notorious, exclusive, and adverse. 





 The Padises did not "make 'changes upon the land' that constitute 'such a control and dominion over the premises as to be readily considered acts similar to those which are usually and ordinarily associated with ownership.'" Peck v. Bigelow, supra, 34 Mass. App. Ct. at 556, quoting LaChance v. First Nat'l. Bank & Trust Co. of Greenfield, supra, 301 Mass. at 491. They have alleged little more than lawn maintenance in the disputed area, and as I have found, they have not established that they maintained the lawn or the "strip," exclusively or otherwise, for the required twenty years. Further, even if they had established that their lawn and plant maintenance in the disputed area occurred over a sufficiently continuous period, they did not establish that this activity was undertaken in such a manner as to exclude the rightful owners from the disputed area. Peck v. Bigelow, supra, 34 Mass. App. Ct. at 557. 





 The Padises mowed, raked, and performed leaf removal within the revised disputed area during the first fourteen to eighteen months they lived at the property (1996 through 1997), but they did not prove that they performed these activities to the exclusion of the Campbells, who, I have found, continued to maintain the same area during the period of their ownership. Nor did I give credence to the claim that the Padises' landscapers performed regular yard maintenance in the disputed area from 1997 through 2018. As stated above, Mr, Padis did not personally observe his hired landscapers Mr. O'Connor or Mr. Kelly performing these activities. [Note 83] Evidence that these landscapers worked at the Padis property was insufficient to establish that they performed work in the disputed area. Further, I do not draw an inference from the invoices paid to Mr. O'Connor and Mr. Kelly, as evidence of mowing and raking in the disputed area, because the invoices do not specify the areas where work was performed. [Note 84] Mr. Padis was not able to testify as to any personal observations as to where they performed their work, and he did not produce any witnesses who could so testify. The mowed lawn areas within the disputed area to which he testified could as easily have resulted from the yard work testified to by the Campbells, which I have credited. [Note 85] Compare Miller v. Abramson, 95 Mass. App. Ct. 828 (2019). The case of Mancini v. Spagtacular, LLC, 95 Mass. App. Ct. 836 (2019), cited by the Padises for the proposition that lawn maintenance can be a sufficient basis for an adverse possession claim, is inapposite. In Mancini, plaintiffs performed lawn maintenance weekly inside a well-defined vegetative boundary that was exclusively maintained by the claimants for a period of twenty years. Mancini v. Spagtacular, LLC, supra, 95 Mass. App. Ct. at 843-844. In contrast, the Padises did not perform lawn maintenance, irrespective of frequency, that was continuous for twenty years, and they most certainly did not perform lawn maintenance exclusively in the disputed area. Compare also, Nannucci v. Hynds, 99 Mass. App. Ct. 901 (2020) (Rule 1:28 Unpublished Decision) (adverse possession established by regular and exclusive raking and mowing that created a "visible and readily apparent line of demarcation alongside the adjacent [property].") 





 Similarly, MacDonald v. McGillvary, 35 Mass. App. Ct. 902 (1993), cited by the Padises to support the assertion that mowing and raking can support a claim of adverse possession, is distinguishable from the present case. In MacDonald, the parties disputed a 2.5-foot shortage of the record boundary line. Id. at 903. The primary issue hinged on the existence of a fence, which remained from 1966 until it fell sometime in the 1970s for a year or two and was replaced and remained through the initiation of the action in 1989. The court nevertheless found the adverse use to be continuous for the requisite twenty year period because remnants of the original wooden fence remained in the disputed area during the one-to-two year period before the fence was replaced and because the McGillvarys continued to use the disputed land to the exclusion of the McDonalds. Id. at 903. Despite the fact the claimants in MacDonald conducted "little more than maintenance of a suburban lawn," the placement of a fence and existence of the fence remnants on the ground during the one-to-two year period before fence replacement, demonstrated the claimants exclusively cared for the disputed area. Id. at 904. 





 In contrast, the Padises' prior privacy panel and existing stockade fence were not permanent, nor were they placed to create an exclusive use of the disputed area. The Padises' original plastic fence, erected from approximately 2007 to 2013 to prevent the Campbells' dog from entering into the Padis yard, [Note 86] and the current privacy panel installed in 2018, [Note 87] were each only about eight feet in length, and therefore did not block or otherwise create the implication that the Padises were enclosing the disputed area to the exclusion of the rightful owners. [Note 88] The Padis privacy panels were provisional at best, and were not the type of permanent fencing placed along the perceived boundary (such as the fence erected in MacDonald), that would result in an exclusive use of the disputed area. 





 Other evidence at trial of the Padises' activities was insufficient to establish all the required elements of adverse possession of the disputed area, even as revised. Activities by the Padises with respect to the arborvitae trees were few, sporadic and non exclusive activities that were insufficient to put the true owners on notice of an adverse claim. Knocking snow off of the arborvitaes is an activity that is likely not even to be noticed, as snow could as easily fall as a result of wind or its own weight. Although "open," such an activity is not "notorious," as it is not "sufficiently pronounced as to be made known, directly or indirectly, to the landowner if he or she maintained a reasonable degree of supervision over the property." Boothroyd v. Bogartz, supra, 68 Mass. App. Ct. at 44. Knocking snow off of a neighbor's tree, even if noticed, is also more likely to be seen as a neighborly act rather than a possessory one, and in any event, is by its nature sporadic. It was also non-exclusive, as I have credited the Campbells' testimony that they also knocked snow off of the same arborvitaes. [Note 89] While Mr. Padis may have cared for the arborvitaes by removing accumulated snow, this activity, like the mowing and raking, was sporadic and intermittent, and was not notorious or exclusive, and therefore, was not sufficient to put the record owners on notice that there was possession by another party. See Martha's Vineyard Land Bank Comm'n v. Taylor, 93 Mass. App. Ct. 1116 (2018) (Rule 1:28 Unpublished Opinion) (daily short walks on footpath in remote wooded area with dense brush as well as minimal trimming, were not 'open and notorious' acts of adverse possession because the geography, topography and vegetation of the area coupled with the rarity of seeing other persons on the path meant the adverse use was unnoticeable). 





 The non-exclusive nature of the act of knocking snow off the trees applies equally to whatever other landscaping activities the Padises were conducting in the disputed area, as I have found that this activity did not serve to exclude the Campbells from their property. Even if the Padises, through their agents, did conduct yard maintenance in the disputed area from 1997 to 2018, which I have found not to be the case, the Campbells continued to maintain the same areas for the entire period of their ownership until 2013. I have found that both Mark Campbell and Christopher Campbell maintained the disputed area through mowing, clearing of underbrush, mulching, weeding, and raking, as well as pruning and knocking snow off of the arborvitaes. [Note 90] An adverse possessor may not gain title to a parcel of land if the land is shared with the true record owner. Chew v. Kwiatkowski, supra, 19 LCR at 91 (Mass. Land Ct. 2011) (Trombly, J). 





 The evidence offered regarding any physical improvements made to the disputed area was limited and did not span the duration of time necessary for a claim of adverse possession, nor did the claimed improvements individually or collectively amount to possessory activities fulfilling the required elements of adverse possession. Specifically, Mr. Padis testified to completing the following activities in the disputed area: 1) placing a supportive band around two arborvitaes in 2005; [Note 91] 2) removal of two damaged arborvitaes in April, 2013; [Note 92] 3) planting of a replacement arborvitae tree in May, 2013; [Note 93] 4) the installation of a plastic panel fence from 2007-2013; [Note 94] and 5) the installation of an eight foot long section of stockade fence in 2018. [Note 95] While these acts are to at least some extent possessory, and therefore could put the record owners on notice of an adverse claim, they were simply too little and too late. These actions, occurring in 2005, 2007- 2013, and 2018 do not, by themselves or collectively, support a conclusion that there was adverse possession for the requisite twenty-year period necessary to prove a claim of adverse possession. 





 The planting of hostas on the "point" and along the paved driveway near the unimproved hillside was outside the disputed area, occurred on one occasion, and the defendants promptly mowed them down. [Note 96] Thus, the planting of hostas does not advance the Padises' claims, as the Padises have properly recognized by their post-trial "relinquishment" of this part of their claim. 





 Similarly, the Padises offered no evidence of use whatsoever with respect to the gravel part of the driveway just west of the boundary line between the two properties other than uses consistent with their deeded easement. They also offered no evidence of use of the unimproved hillside between the driveway and Centre Street other than dumping of leaves and yard waste, an activity also conducted by the Campbells in the same area (part of the former disputed area "relinquished" by the Padises). Neither of these activities were sufficiently adverse to put the Campbells or the Stasas on notice of an adverse claim. In particular, the dumping of leaves and yard waste is, generally and under the circumstances present here, not an act of possession, but is more consistent with an adjacent landowner's attempt to place unwanted debris beyond the bounds of his own property, and thus is not unambiguous treatment of that area as his own. It is pointedly dissimilar to the significant acts of improvement, cultivation, or alteration that are the characteristic uses attendant to ownership. Peck v. Bigelow, supra, 34 Mass. App. Ct. at 556. Furthermore, standing alone, it is the type of "intermittent and equivocal" use of the property that cannot serve to establish actual adverse use of this area. See Kendall v. Selvaggio, supra, 413 Mass. at 624. The Padises, recognizing their failure to present sufficient evidence with respect to the unimproved hillside, have "relinquished" this part of their claim (but apparently not with respect to the gravel part of the driveway). 





Seasonal Decorations in the Revised Disputed Area. 





 Mr. Padis's seasonal placement of holiday decorations is also not sufficient to establish adverse possession. These decorations were placed in various locations in the disputed area, but almost exclusively to the south of the driveway or on the "point," both locations for which the Padises have now relinquished their claims. [Note 97] Regardless of the relinquishment of their claims to these parts of the disputed area, the periodic placement of holiday decorations, and even the placement of a house number and welcome sign on a tree, were insufficient to meet the Padises' burden to demonstrate adverse possession. First, the Padises failed to make a showing that the decorations were displayed in the disputed area continuously for twenty years. [Note 98] There was no showing that the decorations, either individually or in series, were kept in place continuously, and there was no evidence to support a finding, and I make none, that the placement of the decorations was sufficient to put the Campbells or the Stasas on notice of an effort to take a possessory interest, or to exclude them from their record property. [Note 99] Photographic evidence of the presence of items at certain times does not require a trial judge to conclude that the items were in place for a continuous period of twenty years. Brennan v. DeCosta, 24 Mass. App. Ct. 968 , 969 (1987). To the extent the seasonal decorations were otherwise in place continuously, the continuity of this activity was interrupted by the Campbells on at least one occasion (approximately 2004), when they removed lingering Christmas decorations, disposing of a wreath and depositing the remaining decorations in front of the Padis residence. [Note 100] This interruption occurred again after the Stasas took up residence at their property in 2015 and subsequently removed the Padis decorations on the Stasa property on two occasions. [Note 101] 





 Finally, the placement of decorations was, in any event, both intermittent and sporadic, and furthermore was not by its nature possessory. Therefore, the placement of decorations was insufficient to put the record owners on notice of possession by the Padises. The placement of items on the land that are not attached to the land, and therefore not permanent, will ordinarily not support a finding of adverse possession. Peck v. Bigelow, supra, 34 Mass. App. Ct. 556 (picnic table, lounge chairs, clothes lines, rope swing, sandbox insufficient to prove adverse possession). 





 Similarly, the placement of a small address number sign and a small welcome sign on a tree in the disputed area (also in part of the area for which claims have now been relinquished) was not possessory, as the placement just short of the actual property boundary gave no notice to the record owners of an attempt to exclude them from any part of their property. Rather, the placement of two signs along the driveway served as notice to one approaching the property associated with that house number, and was no more an act of possession than would have been a sign in conformance with the common practice of placing address numbers for both properties at the entrance to the driveway near Centre Street. 





 The Padises fare no better treating their claim with respect to the seasonal decorations as one for a prescriptive easement. The placement of these items was entirely outside the areas now claimed to be part of the disputed area, was in varying locations, and its continuity was interrupted by removal by both the Campbells and the Stasas. 





II. THE STASAS ARE ENTITELD TO AN INJUNCTION ORDERING REMOVAL OF THE RECENTLY INSTALLED SECTION OF STOCKADE FENCE. 





 Count II of the Stasas' amended complaint asserts a claim of trespass arising from the Padises' installation in March or April, 2018, of a section of plastic stockade fence, measuring six feet tall by eight feet long, located between the last arborvitae and the Stasas' stockade fence northeasterly toward the record boundary line. [Note 102] Despite requests by the Stasas to remove the fence, it remains on the Stasa property today. [Note 103] There is no dispute that this "privacy fence" is located on the Stasa property - the Padises rather assert the installation of the privacy panel is an act of possession and exclusion of the Stasas over the northern portion of the disputed area, in furtherance of their adverse possession claim. The privacy panel, however, was erected only about four months before the initiation of this lawsuit, apparently in response to the Stasas' removal of trees in this area, on their own record property, and I have already found that the Padises have failed to establish their claim of adverse possession to an area including the location of this section of fence. [Note 104] There is no basis established on the facts as I have found them for this section of fence to remain in place. 





III. THE PADISES ARE ENTITLED TO AN INJUNCTION ORDERING THE REMOVAL OF THE FENCE SUPPORT POSTS ERECTED BY THE STASAS ON THE PADIS PROPERTY. 





 In November, 2016, the Stasas erected two wooden support posts on the Padis property for the purposes of supporting their stockade fence located near the far northeast boundary line near the small disputed area. [Note 105] The Stasas installed the two wooden supports on the Padis property, with the Padises' permission, for the purpose of shoring up the Stasas' stockade fence, which was leaning and compromised. The Padises have since revoked permission for the fence supports. However, as of the date of trial, the fence supports remained in place. [Note 106] I find that there is no legal basis for the encroaching support posts, erected by the Stasas, to remain on the Padises' property absent permission. 





IV. THE PADISES HAVE NOT MET THE BURDEN OF PROOF REQUIRED FOR ADVERSE POSSESSION OR ACQUISITION OF AN EASEMENT BY PRESCRIPTION OVER THE DRIVEWAY. 





Adverse Possession. 





 Initially, the Padises claimed a fee interest in a portion of the driveway, acquired by adverse possession, despite the fact that they benefit from a recorded deeded easement to cross over the Stasa property along the driveway to access Centre Street. The Padises have waived or relinquished this claim, except over the gravel portion of the driveway between the ending of the pavement and the property boundary between the Stasa and Padis properties. Notwithstanding the Padises' partial waiver of this claim subsequent to the trial, the court is inclined to state its findings on this issue without regard to any distinction between the paved and the gravel segments of the driveway on the Stasa property. 





 No evidence was produced at trial that the Padises used the driveway in such a manner as to acquire a fee interest by adverse possession. The Padises' use of the driveway for ingress and egress from their home was consistent with their deeded rights and so did not give rise to notice of any claim of a possessory interest that was adverse, open and notorious, exclusive and continuous for twenty years. Furthermore, there was no evidence to support a finding that the Campbells or the Stasas abandoned their fee interest in the paved portion of the driveway that was previously in dispute (the "neck," or the gravel part of the driveway that apparently remains in dispute), or that they were in any way excluded from this part of the driveway. To the contrary, the Campbells, and later the Stasas, continued to use the "neck" portion of the driveway in the disputed area to turn around vehicles that had been parked on their driveway when leaving their property. I credit Mark Campbell's testimony that his practice when leaving his property was to reverse onto the neck portion of the driveway in order to turn his car around. [Note 107] I also credit the testimony of Gjergji Stasa that the neck was utilized during construction of the Stasa residence [2014 and 2015], and that he continues to use this part of the driveway for maneuvering. [Note 108] Based on this testimony, which I credit, and my personal observations at the view on September 14, 2020, which suggested that backing into the neck part of the driveway would be the most obvious way for cars parked in the Stasa driveway to turn around, I find that there is nothing to suggest abandonment of either the paved driveway or the gravel part of the driveway on the Stasa property by the fee holders. For the same reason, the Padises failed to establish any exclusive use of the parts of the driveway that are the subject of this part of their claim. 





Prescriptive Easement. 





 Acquiring an easement by prescription requires "clear proof of a use of the land in a manner that has been (a) open, (b) notorious, (c) adverse to the owner, and (d) continuous or uninterrupted over a period of no less than twenty years." Smaland Beach Ass'n v. Genova, 94 Mass. App. Ct. 106 , 114 (2018), quoting Boothroyd v. Bogartz, 68 Mass. App. Ct. 40 , 43-44 (2007)."The nature and the extent of occupancy required to establish a right by adverse possession [or by prescription] vary with the character of the land, the purposes for which it is adapted, and the uses to which it has been put." LaChance v. First Nat'l Bank & Trust Co. of Greenfield, supra, 301 Mass. at 490.As with adverse possession claims, the one seeking to establish a prescriptive easement bears the burden of proof on "each and every element." Boothroyd v. Bogartz, supra, 68 Mass. App. Ct. at 44. Whether the elements of a claim for a prescriptive easement have been satisfied is a factual question to be determined by the trial judge. Denardo v. Stanton, 74 Mass. App. Ct. 358 , 363 (2009). 





 The Padises' claim, based on the habit or routine of Mr. Padis of walking his dogs on the driveway, sometimes only part way down the driveway, and not often for the purpose of ingress or egress, that they have established a prescriptive easement. Mr. Padis testified in some detail that he has owned numerous family dogs and that he walks these dogs along the driveway from his property along the entire length of the driveway to Centre Street as well as sometimes just part of the way down the driveway.





 Mr. Padis testified to "typically in the evenings, walking down the driveway to the point and standing on the neck there" in September, 1996 when he first moved onto the property. [Note 109] Mr. Padis testified only that the frequency of these evening walks varied, and occurred two to four times per week beginning in 1996, weather permitting. [Note 110] This activity was not claimed to be anything other than intermittent and seasonal. Accordingly, I do not find an occasional walk part of the way down the driveway to be sufficiently regular and therefore, I find such walks to be sporadic and intermittent. 





 After acquiring his first dog in April, 1999, Mr. Padis would walk the family dogs along the driveway and continued to do so beyond the initiation of this action in May, 2018. [Note 111] Regarding the frequency of this activity, Mr. Padis testified that he walked the family dogs along the driveway two to four times per week, with varied frequency, from April, 1999 through May, 2013 [Note 112] and that his dog-walking increased to three times per day from June, 2013 [Note 113] when he began working from home and did so through May, 2018 following communications with counsel relative to this action. [Note 114] Based on Mr. Padis's testimony, the only interruption of this activity was a period of one month or less in January, 2014 to February 1, 2014, which was the time between the passing of the second Padis dog and the purchase of the third Padis dog, which they still own. [Note 115] Although there was testimony from Mark Campbell that he never observed Mr. Padis walking his dog on the driveway, [Note 116] Christopher Campbell acquiesced that he observed the Mr. Padis walking his dog "a few times." [Note 117] In addition, it would make sense that if Mr. Padis walked his dogs along only a portion of the driveway (for instance, from his property down to the point and back) the Campbells would not have seen this because, depending how far down the driveway Mr. Padis walked, the arborvitaes provided the natural privacy screen for which they were intended. On that basis, I find the Padises' entry and usage of the Stasa driveway for the purpose of walking their dogs, and not for ingress or egress, from April, 1999 to May, 2018 was a non-sporadic, continuous activity for a period of nineteen years. This activity thus falls short of the requisite twenty years, regardless whether it was otherwise adverse, open and notorious. 





Scope of the Driveway Easement. 





 Count III of the Stasas' amended complaint seeks a declaratory judgment declaring that the Padises overburden the driveway easement by walking and standing in the driveway when they are not traversing the entire length of the driveway to Centre Street by motor vehicle. The Stasas argue that dog walking and "loitering" on the driveway overburden the easement because these activities are beyond the scope of the expressly granted rights. 





 The question of whether the scope of the easement includes the right to partially traverse the driveway is governed by the principles of interpretation of the plain language of the grant. Patterson v. Paul, 448 Mass. 658 , 665-666 (2007). The law in Massachusetts is well-settled that an easement granted in general terms, and without express limitation or restrictions, is available for the reasonable uses to which the dominant estate may thereafter be devoted. Marden v. Mallard Decoy Club, 361 Mass. 105 , 107 (1972). "In the absence of express limitations, such a general right of way obtained by grant may be used for such purposes as are reasonably necessary to the full enjoyment of the premises to which the right of way is appurtenant." Tehan v. Security Nat'l. Bank of Springfield, 340 Mass. 176 , 182 (1959), citing Parsons v. New York, New Haven & Hartford Railroad Co., 216 Mass. 269 , 273 (1913). 





 An easement granted in general terms is available for all reasonable, consistent uses, and those uses may change over time. Lawless v, Trumbull, 343 Mass. 561 , 563 (1962); Hayes v. Inniss, 83 Mass. App. Ct. 1138 (2013) (Rule 1:28 Unpublished Decision) (once an easement is created, every right necessary for its enjoyment is included by implication). In balancing the relative rights and duties of the easement holder against the owner of the underlying fee, the governing principle is that neither should unreasonably interfere with the rights of the other. Restatement (Third) of Property, Servitudes § 4.10 (2000); Brodeur v. Lamb, 22 Mass. App. Ct. 502 , 504-505 (1986); Barchenski v. Pion, 9 Mass. App. Ct. 896 , 897 (1980). 





 In Hodgkinds v. Bianchini, the Supreme Judicial Court found that an easement for a "cart road to pass to and from the main street" was not restricted to "use to horse drawn vehicles or limit[ed]... to the width of vehicles then in common use." 323 Mass. 169 , 172 (1948). Similarly, a right of way grant originally used only to access a cottage and barn by foot and carriage, later encompassed uses by motor vehicles to access a four-car garage. Mahon v. Tully, 245 Mass. 571 , 573 (1923). 





 Overburdening comes into play where the use of the easement exceeds what is allowed by right. Swensen v. Marino, 306 Mass. 582 , 583 (1940). Here, the Padises are permitted to cross over the entire length of the driveway for ingress and egress to and from Centre Street. By utilizing only part of the entire route, the Padises do not go beyond what is expressly permitted under the easement but rather, they are within the limitations set forth in the language of the easement. If they can go all the way down the driveway, they are not overburdening the easement if on occasion, they only go part of the way down the driveway. 





 Likewise, there is no basis to conclude overburdening will occur if the use of the easement is different from what was contemplated at the time of creation: access to and from Centre Street. See Brown v. Ryan, 16 LCR 29 , 32 (Mass. Land Court 2008) (Piper, J.) (discussing right to maximize use of easement in a reasonable way); see also Lane v. Zoning Bd. of Appeals, 65 Mass. App. Ct. 434 , 440 (2006) (overburdening defined as uses which exceed the scope of easement rights). The owner of the Padis property has, as described above, an easement to cross the entire length of the Stasa driveway. At the time of the conveyance, the easement served as access to and from the Padis property, and still does so today, whether or not the Padises at times utilize less than what is permitted under the recorded easement. In this case, the purpose of the easement is to provide access to and from Centre Street - this purpose remains undisturbed whether or not the Padises elect at times to traverse the entire length of the driveway or only part of the way down the driveway. It is not overburdening to do less than is permitted, and the act of walking part of the way down the driveway, without continuing all the way to Centre Street, is not inconsistent with the purpose of the easement for access and ingress to the Padis property. Furthermore, the Stasas did not demonstrate in any credible way that the Padises' use of the driveway in the manner or frequency described, interferes with the reasonable use of the servient estate. As a practical matter, if the court accepts the interpretation proposed by the Stasas, the Padises' use could actually increase if they are required to travel the entire length of the driveway every time they walk their dog. 





 Similarly, there is nothing to suggest that traveling the driveway by foot (versus vehicle) constitutes overburdening of the easement. The easement provides for "ingress and egress of the Grantees and their motor vehicles... to and from Center Street...." [Note 118] Because the easement was granted in general terms, and without express limitation or restriction, the manner in which the driveway is accessed - whether by foot or motor vehicle - falls within the scope of the easement. Compare Clarkin v. Duggan, 292 Mass. 263 (1935), in which the language used in the grant of the easement expressly limited the use of the right of way to "teams only." Id. at 264. In Clarkin, the Supreme Judicial Court found that the grant of a "right of way across my land (with teams only) from said road on the North side of my dwelling house" limited the use of the servient estate to equestrian travel, and did not permit use by motor vehicles, on the basis of the specific, limiting language, teams "only". Id. at 265-266; see also Reynolds v. Hyman, 86 Mass. App. Ct. 1123 , slip op. p. 7, fn. 13 (Dec. 8, 2014) (Rule 1:28 Unpublished Decision) (general grant easement for vehicular access, that did have further limiting language, interpretated to permit all reasonable uses and application for ingress and egress, including travel by foot. 





 In the present case, no such limiting language exists, and because the grant is general, pedestrian use of the driveway is normal and consistent with the scale of the easement, and thus is reasonable in light of the purpose of the easement. Packard v. Trip, 14 LCR 163 , 165 (Mass. Land Court 2006) (Long, J.) (pedestrian use of driveway authorized for right of way by express grant). By walking their dog(s) along the easement route, the Padises are not usurping the Stasas' driveway, nor otherwise interfering unreasonably with the Stasas' use or enjoyment of their property. Rather, this activity is within the scope of their rights of access to and from Centre Street. 





 As such, I find that the Stasas are not entitled to a declaratory judgment prohibiting the Padises from walking, with or without their dog, over the length of the driveway, in whole or in part. 





CONCLUSION 





 For the reasons stated above, the Padises have not satisfied their burden of proving ownership by adverse possession of the disputed area, as originally claimed, or as revised, over any portion of the Stasa property at 518 Centre Street. Nor have they established a claim of easement by prescription. 





 Conversely, the Stasas have met their burden of proving ownership by adverse possession over the "small disputed area," which consists of the area enclosed by the stockade fence and occupied in part by the concrete pad that encroaches onto the northwest corner of the property at 534 Centre Street in Milton, the Padis property, and are entitled to a declaratory judgment to that effect. 





 A judgment will issue declaring the rights of the parties, and in particular, declaring that the Stasas have established their ownership by adverse possession of an encroachment of a stockade fence and concrete pad onto 534 Centre Street, for a length of approximately 50.0 feet and a depth of 8.5 feet at its widest point, as depicted on Exhibit 9. 





 Prior to the entry of judgment, the Stasas are ORDERED to submit to the court, within thirty days of the date of this decision, a stamped plan, in size and format suitable for attachment as an exhibit to the judgment, showing the encroachment of the concrete pad and stockade fence, including the dimensions and area of the encroachment. The plan shall be submitted to the Padises prior to submission to the court, and if the parties are unable to agree on the accuracy of the plan, the parties are to so inform the court and a hearing will be held on the suitability of the plan. 





FOOTNOTES
[Note 1] Exhibit ("Exh.") 9, "Plan of Land, 518-534 Centre Street, Milton, Mass." dated November 5, 2018, revised March 4, 2019, prepared by Decelle-Burke-Sala. 

[Note 2] Stasas' amended complaint, pp. 5-6. 

[Note 3] Additional findings of fact are contained in the discussion section, infra. 

[Note 4] Exh. 1, Deed for 518 Centre Street from Nancy Campbell and William Campbell to Gjergii Stasa and Denisa Stasa, dated December 20, 2013. 

[Note 5] Exh. 28, Deed for 518 Centre Street to Nancy Campbell dated May 7, 1976. 

[Note 6] Exh. 1; Tr. Vol. I pp. 159-160, Testimony of Nancy Campbell that she lived at 518 Centre Street for "close to 40 years"; Tr. Vol. I p. 144, Testimony of Mark Campbell that he lived at 518 Centre Street from 1976 until 2010; Tr. Vol. I pp. 168-169, Testimony of Christopher Campbell that he maintained his primary residence at 518 Centre Street until the sale of the property to the Stasas in 2013. 

[Note 7] Exh. 3, Deed for 534 Centre Street to Alexander Padis and Kathleen Padis dated September 16, 1996. 

[Note 8] Exh. 9. 

[Note 9] Exh. 4, Plan entitled "Plan of Land in Milton, Mass." dated November 24, 1945, prepared by C. Fred Joy, Jr.; View of properties taken on September 14, 2020. 

[Note 10] Tr. Vol. I, p. 104; View of properties taken on September 14, 2020. 

[Note 11] Exh. 2, "Plan of Land in Milton, Mass.," dated April 27, 1976, prepared by Ernest W. Branch, Inc. 

[Note 12] Exh. 25, "Conceptual Site Plan" for 518 Centre Street, dated April 30, 2014, prepared by DeCelle Burke & Associates, Inc. 

[Note 13] Tr. Vol. I, pp. 31-32, 174; Exh. 5, Confirmatory Easement. 

[Note 14] Exh. 9. 

[Note 15] Exh. 24, "Plot Plan of Land," dated April 23, 2019, prepared by Hoyt Land Surveying; View of properties taken on September 14, 2020. 

[Note 16] Exh. 9; Exh. 29, Town of Milton Assessor's Map, 518 and 534 Centre Street (for visual aid only, not a legal description). 

[Note 17] Exh. 9; View of properties taken September 14, 2020. 

[Note 18] Exh. 5, Confirmatory Easement, pp. 3-4. 

[Note 19] Exh. 9; Tr. Vol. I, pp. 32, 50-51, description of the strip as a grassy area, now containing moss (prevalent for the last few years). 

[Note 20] Exh. 9. 

[Note 21] Exh. 9; Tr. Vol. I, pp. 31-32. 

[Note 22] Padises' post-trial brief, p. 3. 

[Note 23] Per the Padises' post-trial brief, p. 7 and accompanying Exhibit A, the revised disputed area includes a small segment of gravel driveway between the paved driveway and the record boundary line. It is unclear whether defendants perceive the gravel segment to be part of the "neck" or the "strip" or whether it is in fact part of the driveway easement, to which they have waived their claim of adverse possession. 

[Note 24] The "relinquishment" of the Padises' claim as it pertains to the larger disputed area is not accompanied by a stipulation of dismissal of their counterclaims, or by a motion to amend their counterclaims to conform to the evidence. Further, it is accompanied by a statement of the Padises' belief that the claim remains "arguable." Accordingly, as this case requires the court to declare the rights of the parties, the court will address the parties' rights with respect to the entire "large" disputed area, as the Padises' claims remain part of the pleadings and have not otherwise been disposed of properly. See Padises' post-trial brief, pp. 2-3. 

[Note 25] Tr. Vol. I, p. 132. 

[Note 26] Tr. Vol. I, pp. 132-133, 170. 

[Note 27] Tr. Vol. I, p. 170. 

[Note 28] View of properties taken on September 14, 2020. 

[Note 29] Tr. Vol. I, pp. 29, 140, 175. 

[Note 30] Stasas' amended complaint; Padises' amended answer & counterclaims, Exh. 12. The Padises have since "relinquished" their counterclaim of adverse possession to a significant portion of the large disputed area, including a segment of unimproved hillside between the paved driveway and southern boundary line of the Stasa property fronting Centre Street. See the Padis post-trial brief, p. 3. 

[Note 31] Tr. Vol. I, p. 128. 

[Note 32] Exh. 9. 

[Note 33] Tr. Vol I, p. 10. 

[Note 34] Tr. Vol. I, p. 72. 

[Note 35] Exh. 12, Letter dated February 13, 2019 from attorney Paul Barbadoro to attorney Stephen Griffin regarding the encroachment on the Padis property; Tr. Vol. I, p. 81. 

[Note 36] Tr. Vol I, pp. 72-73, Tr. Vol. II, p. 79. 

[Note 37] Tr. Vol I, pp. 50-51, 84. 

[Note 38] Tr. Vol. I, p. 52-54. 

[Note 39] Tr. Vol. I, pp. 55-56. 

[Note 40] Tr. Vol. I, p. 21-22, Testimony of Alexander Padis that he worked outside of the home until June, 2013. 

[Note 41] Tr. Vol. I, p. 53, Testimony of Alexander Padis. "I observed that he had cut the grass on the strip and that he [Mr. O'Connor] had cut the grass on our side of what is the privacy panel. And I sometimes observed that he had cut the grass on the other side of the neck, opposite the arbor[vitaes], well in." 

[Note 42] Tr. Vol. I, p. 54, Testimony of Alexander Padis. "I don't recall observing him [Mr. O'Connor] doing it [the raking]. I recall looking at the area after he was done." 

[Note 43] Tr. Vol I, pp. 59-60. 

[Note 44] Id. 

[Note 45] Tr. Vol. I, pp. 60-61. 

[Note 46] Tr. Vol. I, pp. 61, 114; Exh. 21, Invoice from Fast-Growing-Trees.com for Thuja Green Giant dated May 13, 2013. 

[Note 47] Tr. Vol. I, p. 60. 

[Note 48] Tr. Vol. I, pp. 36-37; Exh. 13, pp. 28-29 (photographs of the point which shows small plantings on the point west of the arborvitaes). 

[Note 49] Tr. Vol. I, p. 184, Testimony of Christopher Campbell acknowledging the hostas planted by the Padises. As described, the hostas were observed on the "point," which is outside of both the large disputed area originally claimed by the Padises as well as the revised disputed area to which the Padises maintain their claim of adverse possession. 

[Note 50] Tr. Vol. I, p. 149-150, Testimony of Mark Campbell acknowledging "cabbages" planted by the Padises. 

[Note 51] Tr. Vol. I, p. 149-150, Testimony of Mark Campbell: "[Mr. Padis] planted, like, four or five cabbages around there to -- you know, to make it look nice. And after like about a month with more weeds, I took the mower and just ran over them and got rid of them, because I thought it was easier with mulch." 

[Note 52] Tr. Vol. I, pp. 135-136. 

[Note 53] Tr. Vol. I, p. 136. 

[Note 54] Tr. Vol. I, pp. 140-141. 

[Note 55] Tr. Vol. I, p. 170, Testimony of Christopher Campbell regarding yard work performed in the disputed area, on both sides of the arborvitaes as well as on the "point": "Mowing, raking. The arborvitaes, during the snow, hit them with a rake so they don't bow over. Occasionally have them trimmed. Yeah. All -- anything that was done in that area that was done by us [the Campbells]." 

[Note 56] Tr. Vol. I, pp. 131-132, 135. 

[Note 57] Tr. Vol. I, p. 136. 

[Note 58] After purchasing the Campbell property in 2013, the Stasas razed the existing house and built a new house. See Tr. Vol. II, p. 5. 

[Note 59] Tr. Vol. II, p. 11. 

[Note 60] Tr. Vol. II, p. 8. 

[Note 61] Tr. Vol. I, pp. 39-40. 

[Note 62] Tr. Vol. I, pp. 40, 45-46. 

[Note 63] Tr. Vol. I, pp. 139-141. 

[Note 64] Tr. Vol. I, pp. 41, 46. 

[Note 65] Tr. Vol. I, p. 162; Exh. 13, pp. 1-2(photographs of properties/disputed area). 

[Note 66] Tr. Vol. I, pp. 149-150, 162; Tr. Vol. I, p. 48, noting there is conflicting testimony as to the year in which the Padis decorations were removed by the Campbells (Alexander Padis testified to confronting Nancy Campbell about the removed decorations in February, 2001). 

[Note 67] Tr. Vol. I, pp. 173-174, Testimony of Christopher Campbell, regarding the Padises' Christmas wreath; Tr. Vol. I, pp. 162-163, Testimony of Nancy Campbell regarding removal of the Padises' Christmas decorations. 

[Note 68] Tr. Vol. I, p. 40-41; Exh. 13, pp. 3, 9-12. 

[Note 69] Tr. Vol. I, pp. 74, 90, 99; Exh. 6, photograph of privacy fence and stumps. 

[Note 70] Exh. 7, Letter dated April 9, 2018 from Stephen Griffin to Alexander Padis regarding encroachment by privacy panel. 

[Note 71] Exh. 8, Letter dated April 19, 2018 from Jonathan Braverman to Stephen Griffin in response to issue of the privacy fence. 

[Note 72] Tr. Vol. I, pp. 33-36, 105. 

[Note 73] Tr. Vol. I, pp. 35-36, 105. 

[Note 74] Tr. Vol. I, p. 119. 

[Note 75] Tr. Vol. I, pp. 34-35. 

[Note 76] Tr. Vol. I, p. 36, 119. 

[Note 77] Tr. Vol. I, p. 143. 

[Note 78] Tr. Vol. I, pp. 174, 187. 

[Note 79] Tr. Vol. II, pp. 26-28. 

[Note 80] Tr. Vol. I, pp. 38, 91-92. 

[Note 81] Padises' post-trial brief, p. 3, and Exhibit A: the remaining disputed area consists of the strip and the open area after the arborvitaes from the privacy fence to the bean pole (highlighted on Exhibit A of the post-trial brief) as well as a portion of the gravel driveway. This excludes the "point" as well as the unimproved hillside, previously claimed by the Padises as the lower portion of the large disputed area. 

[Note 82] As an apparent claim of right, this does not require the claimant to actually communicate to the record owner such a claim of right or intent to oust, or even to subjectively possess such an intent; the court must look not to the state of mind of the claimant, but rather must look to the existence of objective acts, such as physical entry and possession, that are inconsistent with the true owner's rights. See AM Props., LLC v. J&W Summit Ave., LLC, 91 Mass. App. Ct. 150 , 156 (2017). 

[Note 83] Tr. Vol I, pp. 54-56; Padises' post-trial brief p. 18, ¶ 19. 

[Note 84] Exh. 18, Invoice of Landscaping Services, and Cancelled checks from the Padises to Tom O'Connor from 1997-1998; Exh. 19, Payment Ledgers Invoices Cancelled Checks for Mark Kelly for Law Services (1999-2018). 

[Note 85] Exhs. 18, 19. 

[Note 86] Tr. Vol. I, pp. 73-74, Testimony of Alexander Padis regarding the initial privacy panel installed by the Padises from 2007-2013 to prevent the Campbell's dog from crossing into the Padis yard. 

[Note 87] Tr. Vol I, pp. 90, 92-93, 99. 

[Note 88] Tr. Vol. I, p. 93. 

[Note 89] Tr. Vol. I, pp. 135, 140-141, 170. 

[Note 90] Tr. Vol. I, pp. 129-131, 135-136, 140-141, 144-145, 170-171. 

[Note 91] Tr. Vol. I, pp. 59-60. 

[Note 92] Tr. Vol. I, pp. 60-61. 

[Note 93] Tr. Vol. I, pp. 61, 114. 

[Note 94] Tr. Vol I, pp. 73-74. 

[Note 95] Tr. Vol. I, pp. 76-77, 90. 

[Note 96] Tr. Vol. I, pp. 36, 150. 

[Note 97] Tr. Vol. I, pp. 40-41, 46, 146-147; Exh. 13 (photographs of seasonal decorations). 

[Note 98] Tr. Vol. I, pp. 41, 46. 

[Note 99] Tr. Vol. I, p. 62; Exh. 13, pp. 1, 59-62. 

[Note 100] Tr. Vol I, pp. 48-49, 173-174. 

[Note 101] Tr. Vol. II, pp. 29-30. 

[Note 102] Tr. Vol. I, pp. 76-77, 99-100, 117-118; Exh. 13, p. 33 (photograph of privacy fence). 

[Note 103] Tr. Vol. II, pp. 21, 23; Exh. 7, Letter dated April 9, 2018 from Stephen Griffin to Alexander Padis regarding encroachment onto Stasa property. 

[Note 104] Tr. Vol. I, p. 118; Tr. Vol. II, pp. 19-21. 

[Note 105] Tr. Vol. I, pp. 72-73. 

[Note 106] Tr. Vol. II, p. 79; Exh. 12, Letter dated February 13, 2019 from Paul Barbadoro to Stephen Griffin regarding encroaching stockade fence and fence supports. 

[Note 107] Tr. Vol. I, p. 136-137. 

[Note 108] Tr. Vol. II, pp. 47-49. 

[Note 109] Tr. Vol. I, pp. 33-34. 

[Note 110] Tr. Vol. I, p. 119. 

[Note 111] Tr. Vol. I, pp. 34, 119. 

[Note 112] Id. 

[Note 113] Tr. Vol. I, pp. 36, 119. 

[Note 114] Tr. Vol. I, p. 119. 

[Note 115] Tr. Vol. I, p. 35. 

[Note 116] Tr. Vol. I, p. 139. 

[Note 117] Tr. Vol. I, p. 174. 

[Note 118] Exh. 5, Confirmatory Easement (emphasis added). 


 
 Home/Search 
 Land Cases by Docket Number
 Land Cases by Date 
 Land Cases by Name
 


 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.